593 P.2d 711

In the Matter of Jolene Lucille Byerly TUMA, R.N., Defendant-Appellant,

v.

BOARD OF NURSING of the State of Idaho, Plaintiff-Respondent.

No. 12587.

Supreme Court of Idaho.

April 17, 1979.

Donald J. Chisholm, of Goodman, Duff & Chisholm, Rupert, for defendant-appellant.

Wayne Kidwell, Atty. Gen., Wayne V. Meuleman, of Park & Meuleman, Boise, for plaintiff-appellee.

BISTLINE, Justice.

Appellant Tuma challenges an order entered by respondent Board of Nursing (Board) which suspended her registered nurse's license for 6 months, the Board acting on the decision of a Board-appointed hearing officer who found Tuma guilty of "unprofessional conduct."

During March of 1976, Tuma was employed as a clinical instructor of nursing by the College of Southern Idaho. Her duties included performing nursing services while supervising student nurses at the Twin Falls Clinic and Hospital (Hospital).

On March 3, 1976, Grace Wahlstrom, a hospital patient, for brevity hereinafter referred to as patient, was informed by her attending physician that she was dying of myelogenous leukemia, that it was malignant, and that her only hope of survival was chemotherapy. She was also told that the drugs involved are life threatening and have undesirable side effects which reduce the body's defense mechanisms, making the patient susceptible to infection and necessitating that the patient be placed in reverse isolation.

Tuma, aware of the patient's condition and interested in the special needs of dying patients, asked to be assigned to the patient and to administer the prescribed chemotherapy. Tuma discussed the patient's condition and background with her. The patient had fought leukemia for 12 years and attributed her success to her belief in God and to her faithful practice of her religion. They discussed work done by the L.D.S. Hospital in Salt Lake City using chaparral and laetrile, as well as the side effects of the drugs used in the chemotherapy. The patient pleaded with Tuma to return that evening to discuss an alternative treatment using natural products with the patient's family. Tuma consented to the meeting.

Tuma and a student nurse, Candice Freeman, then commenced the patient's chemotherapy. Freeman testified that Tuma told the patient that discussing these matters "wasn't exactly ethical." The patient acknowledged this but still requested Tuma to come back that night. Freeman also testified that Tuma told her to forget what she had heard because it wasn't "exactly legal."

About two hours later, the patient was called by her daughter-in-law Penny. Penny testified the patient wanted her family to meet Tuma and discuss the alternative treatment. The patient asked Penny not to inform the doctor because this could cause trouble for Tuma. However, Penny called the doctor and informed him of the conversation. He requested that Penny get the name of the nurse, but he did nothing to interfere with the scheduled meeting; nor did he take up the matter with the patient. The doctor ordered the chemotherapy stopped at 8:00 p. m. because of the patient's change of attitude. At 8:00 p. m. that evening, Tuma met with the patient and her family. They discussed the prescribed treatment, its side effects, and alternatives provided by natural foods and herbs, as well as the fact the patient would have difficulty getting treatment, particularly blood transfusions, if she left the hospital. Laetrile was discussed as an alternative form of treatment that does not produce the adverse side effects of drugs used in chemotherapy. The patient's son testified that Tuma said her discussion with them was "somewhat unethical." After a brief discussion, the parties decided that the patient should remain in the hospital and continue the chemotherapy. The treatment was resumed at 9:15 p. m. that evening.

The patient died two weeks later on March 18, 1976. During the chemotherapy, the patient did experience adverse side effects and was comatose much of the time. There was no contention nor evidence that Tuma's acts in any way contributed to the death of the patient.

Sometime in March, the Board received a telephoned complaint by Hospital personnel that Tuma had interfered with the physician-patient relationship. The Board's Director wrote to people familiar with the facts and asked them to submit their complaints in writing. This was done by the Hospital personnel, but no letter was received from the patient's family. A petition for the suspension or revocation of Tuma's license was then prepared by the Director and submitted to the Board, which set the petition for hearing.

The petition alleged that Tuma, for some time prior to March 5, 1976, had interfered with physician-patient relationships at the Twin Falls Clinic Hospital, Twin Falls, Idaho, in that: (1) Tuma stated to two patients, Mrs. Grace Wahlstrom and Mickey Klimes,[1] that the physician's treatments would kill them; (2) that they should discharge themselves from the hospital, and the care of a naturopath would be arranged for them by said licensee; and (3) that treatment by use of laetrile, natural hormones and herbs would cure said patients. It further alleged that such aforesaid conduct constituted unprofessional and dishonorable conduct, warranting revocation of her license.

A hearing was held and the hearing officer found as facts that: (1) Tuma did not tell the patient that chemotherapy would kill her; (2) Tuma did not say that the patient should discharge herself from the hospital; (3) Tuma did discuss natural products as an alternative treatment, but did not say that the alternative treatment would cure the patient; (4) Tuma said that care of a "reflexologist" would be arranged if the patient decided to accept the alternative form of treatment and circumstantial evidence indicates that Tuma would make the arrangements; (5) the doctor stopped the treatment for a brief time after hearing of the conversation; and (6) Tuma's actions interfered with the physician-patient relationship. The hearing officer concluded

1. The parties stipulated that no evidence would be presented as to any conversations between Tuma and Mickey Klimes.

that Tuma "had violated Idaho Code Section 54–1422(a)(7), by interfering with the physician-patient relationship and thereby constituting unprofessional conduct." The Board approved the findings of the hearing officer, and suspended Tuma's license for 6 months. This decision was appealed to the district court where Tuma asked for a trial *de novo*, which motion was denied. On a summary review of the record, the district court entered judgment, without opinion, affirming the decision of the hearing officer and the order of the Board suspending Tuma's license. Tuma then filed a notice of appeal to this Court.

The primary issue on this appeal, and the resolution of which we find to be dispositive, is whether the due process rights of Tuma are satisfied by a statute which authorizes the suspension of her professional license to practice nursing on the grounds of "unprofessional conduct" in the absence of statutes or regulations specifically defining "unprofessional conduct," as applied to the conduct which was here held to be unprofessional.

█ The right to practice one's profession is a valuable property right. A state cannot exclude a person from the practice of his profession without having provided the safeguards of due process. *Schware v. Bd. of Bar Examiners*, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957). In *Ferguson v. Bd. of Trustees of Bonner County Sch. Dist. No. 82*, 98 Idaho 359, 364, 564 P.2d 971, 976 (1977), this Court recognized that a "teaching position was a property interest and [a teacher] could not be deprived of this interest without notice and an opportunity to be heard."

In that case the primary issue was procedural due process, *i. e.*, the adequacy of the notice of charges and the adequacy of the hearing. However, we also noted in *Ferguson* "that school boards are given broad authority to define what constitutes grounds for discharge *by promulgation of rules and regulations governing professional conduct of school teachers . . . .*" *Id.* at 362, 564 P.2d at 974 (emphasis supplied).

The Board of Nursing (differently styled) was created by chapter 76, 1951 Idaho Sess. Laws, at 129. That Act, in addition to making provision for the examination and licensing of nurses, provided for revocation or suspension of a license upon proof that a licensee:

(1) Is guilty of fraud or deceit in procuring or attempting to procure a license to practice nursing.

(2) Is guilty of a crime or gross immorality.

(3) Is unfit or incompetent by reason of negligence, habits or other causes.

(4) Is habitually intemperate or is addicted to the use of habit-forming drugs.

(5) Is mentally incompetent.

(6) Is guilty of unprofessional conduct.

(7) Has wilfully or repeatedly violated any of the provisions of this Act or rules and regulations promulgated by the Board.

The Board was specifically "authorized and empowered to adopt and from time to time revise such rules and regulations not inconsistent with the law as may be necessary to enable it to carry into effect the provisions of this act."

By amendments passed in 1963, 1965, 1971, and 1974, provisions for revocation or suspension of a nursing license as effective in 1976 were found in I.C. § 54–1422 (amended in 1965 by ch. 92, 1965 Idaho Laws), with grounds declared as follows:

(1) Fraud or deception in procuring or attempting to procure a license to practice nursing.

(2) Practicing nursing under a false or assumed name.

(3) Conviction of a crime involving moral turpitude.

(4) Gross incompetency.

(5) Habitual intemperance in the use of ardent spirits, narcotics or stimulants.

(6) Mental incompetence.

(7) Immoral, unprofessional or dishonorable conduct.

Unprofessional conduct defined: Without intent to limit the general term "unprofessional conduct," as used in this

chapter, or without intent to limit the board in exercising its powers as provided in this nurse practice act, the following are declared to be acts of unprofessional conduct:

(a) Any practice or behavior of a character likely to deceive or defraud the public.

(b) Obtaining of any fee or compensation by fraud, deceit, or misrepresentation.

(c) Advertising by any means whatsoever of the practices of nursing in which untruthful or misleading statements are made.

(8) Wilful or repeated violation of any of the provisions of this act, or rules and regulations promulgated by the board.

Our only concern today is with (7) above, and that is narrowed further by eliminating therefrom conduct which is immoral and conduct which is dishonorable. We first observe the inapplicability of the statutory definition of unprofessional conduct set forth explicitly in (7)(a), (b) and (c). Thus we are left with a statute proscribing "unprofessional conduct" but without any statutory definition of that phrase applicable to the case under review.

Notwithstanding that since the passage of the first Nurse-licensing Act in 1951, the legislature did not change in any way the broad power and authority of the Board "to adopt and from time to time revise such rules and regulations not inconsistent with the law as may be necessary to enable it to carry into effect the provisions of this act," and notwithstanding the clear statement of I.C. § 54–1422 that the legislative definitions of unprofessional conduct were not any limitation on the part of the Board "in exercising its powers as provided" to it by the Act, the Board has not over many years ever promulgated any rules and regulations further defining unprofessional conduct.[2]

Yet we note that in *Ward v. Oregon State Bd. of Nursing*, 266 Or. 128, 134, 510 P.2d 554, 557 (1973), one of the cases relied upon by the Board, the Oregon Supreme Court *en banc* stated that "one of the characteristics of a profession is its responsibility *to formulate standards of conduct for its members.*" (Emphasis added.) In yet another case relied upon by the Board, *Scott v. State ex rel. Bd. of Nursing*, 196 Neb. 681, 686–87, 244 N.W.2d 683, 687 (1976), it is pointed out that "[t]he statutes of Nebraska which regulate the issuance of professional nurses' licenses do not define unprofessional conduct. The Board of Nursing has adopted general standards as to what is included in the term unprofessional conduct." Similarly in *Reyburn v. Minnesota State Board of Optometry*, 247 Minn. 520, 78 N.W.2d 351, 355 (1956), a case relied upon by the Nebraska court in its *Scott* decision, the legislature made "unprofessional conduct" grounds for revocation or suspension, and, as with the Idaho act, defined *some* conduct which would constitute unprofessional conduct, impliedly leaving further definition to the board. The court said that the authority so conferred upon a board was "to declare as 'unprofessional' *only* such conduct as fails to conform to those standards of professional behavior which are recognized by a consensus of expert opinion as necessary for the public's protection." (Emphasis in original.)

Tuma argues that her conduct which is challenged as unprofessional, *i. e.*, her discussions with the patient, cannot be made the basis for suspending her license. She contends that she cannot be punished for acts the doing of which at the time done had not been proscribed by the legislative definition, or by any definition of standards by the Board. She points to *Bojack's, Inc. v. Dept. of Law Enforcement*, 91 Idaho 189, 191, 418 P.2d 552, 554 (1966), where this

---

**2.** The legislature also provided in I.C. § 54–1414(c) that "the policies of the board regarding . . . discipline of professional and practical nurses *shall* conform so far as practicable to the policies and practices of the American Nurses Association . . . ." (Emphasis added.) Yet when Tuma sought to testify concerning her knowledge of the "American Nurses Association's Code for Nurses with Interpretive Statements," evidently to show her awareness of its code of ethics, and that she subscribed to it, the Board objected. The hearing officer sustained the objection.

Court explicitly held that a "statute providing for the suspension of a retail license, is penal in nature and will not be broadened or extended by construction to include or penalize acts or conduct not clearly within its terms."

■ The Board argues that "unprofessional conduct" need not be further defined, that such "is that which is recognized to be unsafe or improper by the profession itself." Here, however, the "profession itself" through its State Board of Nursing has not availed itself of the afforded opportunity to expand upon the legislative definition. The Board has not declared any standards of professional conduct, nor has it defined or declared those acts which are either forbidden or required, on penalty of being held guilty of unsafe or improper practices. For that reason Tuma argues that the statute is unconstitutionally vague. She cites *State v. Pigge*, 79 Idaho 529, 532, 322 P.2d 703, 705 (1957), *rehearing denied*, where the Court held:

> Before a man can be punished, his case must be plainly and unmistakably within a statute. A statute that either forbids or requires the doing of an act in terms so vague that men of common intelligence must guess as to its meaning and differ as to its application lacks the first essential of due process of law.

We do not agree that the Act is unconstitutional. Rather we believe that it is constitutional, but only so far as it goes. It does define "unprofessional conduct," albeit on a limited basis, and proscribes some types of unprofessional conduct not applicable here. The fault is not in the statute, but lies in the fact that the conduct here alleged as unprofessional, *i. e.*, interference with the doctor-patient relationship, is not within the legislative definition, and the conduct here involved has not been declared unprofessional by the Board.

■ Nevertheless, while the statute in question is not facially vague, it cannot withstand scrutiny for *vagueness as applied* to the specific conduct here made the basis of Tuma's license suspension. The void-for-vagueness doctrine, although not there so

named in that terminology, was clearly the heart of the Court's decision in *Pigge*. Recently in *State v. Lopez*, 98 Idaho 581, 590, 570 P.2d 259, 268 (1977), *on rehearing*, this Court summarized the doctrine:

> The concept of void-for-vagueness arose from a common law practice of refusing to enforce legislation deemed too indefinite to be applied. *See*, Amsterdam, "The Void-for-Vagueness Doctrine in the Supreme Court," 109 U.Pa.L.Rev. 67 (1960). It has evolved to a protection generally regarded as embodied in a Due Process Clause and prohibits holding a person "criminally responsible for conduct which he could not reasonably understand to be proscribed." *U. S. v. Harriss*, 347 U.S. 612, 617, 74 S.Ct. 808, 812, 98 L.Ed. 989 (1954). In addition to this notion of "fair notice or warning" the doctrine is said to require reasonably clear guidelines to prevent "arbitrary and discriminating enforcement" and to prescribe a precise standard for the adjudication of guilt. *Smith v. Goguen*, 415 U.S. 566, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974). *See also*, Amsterdam, *supra*, at 76. The principle consistently followed is that "a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law."

(Citations omitted.) The principle of void-for-vagueness is equally applicable to statutes prescribing a standard of conduct which, though not subject to criminal sanctions for violations thereof, is subject to regulation by an administrative board or agency. In *Hall v. Bureau of Employment Agencies*, 64 Cal.App.3d 482, 138 Cal.Rptr. 725 (1976), the licensee's business, an employment agency, was subject to the State Bureau of Employment Agencies. He was charged with breaches of unprofessional conduct, made grounds for disciplinary action by section 9993(a) of the Business and Professions Code. That section did not at all define unprofessional conduct. The Agency, however, had promulgated Califor-

nia Administrative Code § 2857, which did declare some types of unprofessional conduct, the full text of § 2857 being set out in the opinion at page 493, 138 Cal.Rptr. 725. The court observed that "unprofessional conduct" standing by itself would be ambiguous, but the setting of standards by § 2857 "provides sufficient notice to employment agencies of what kind of conduct is regulated and within the prohibition of the disciplinary ground of 'unprofessional conduct' . . . ." *Id.* at 493, 138 Cal.Rptr. at 730.

Citing the earlier case of *McMurty v. State Bd. of Medical Examiners*, 180 Cal. App.2d 760, 4 Cal.Rptr. 910 (1960), in *Hand v. Bd. of Examiners in Vet. Med.*, 66 Cal. App.3d 605, 621, 622, 136 Cal.Rptr. 187, 197 (1977), the California court stated:

> "It is well settled that 'a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law.' [Citations.] This principle applies not only to statutes of a penal nature but also to those prescribing a standard of conduct which is the subject of administrative regulation. [Citations.] The language used in such legislation 'must be definite enough to provide a standard of conduct' for those whose activities are prescribed as well as a standard by which the agencies called upon to apply it can ascertain compliance therewith. [Citation.]

In *Morrison v. State Bd. of Education*, 1 Cal.3d 214, 82 Cal.Rptr. 175, 187–188, 461 P.2d 375, 387, 388 (1969), an authority cited in *Hand, supra*, the Supreme Court of California, *en banc*, considered the revocation of a school teacher's license which prevented him from teaching in any public school in the state. His license was revoked because of "unprofessional conduct," as well as "immoral conduct" and acts involving "moral turpitude." In its consideration of a void-for-vagueness challenge, the court there said:

> "Civil as well as criminal statutes must be sufficiently clear as to give a fair warning of the conduct prohibited, and

they must provide a standard or guide against which conduct can be uniformly judged by courts and administrative agencies. [Citations.] The knowledge that he has erred is of little value to the teacher when gained only upon the imposition of a disciplinary penalty that jeopardizes or eliminates his livelihood."

In *Morrison*, the statute was saved from a holding of facial vagueness by a judicial interpretation construing the statutory language to constitute a ban on conduct which would indicate an unfitness to teach. *Id.* 82 Cal.Rptr. at 1189, 461 P.2d at 389.

With respect to Tuma, however, there appears to be no contention whatever that she is unfit to nurse, but rather that she should be punished for the act of talking to the patient about procedures alternative to those which the patient was receiving. The *Morrison* court noted that its saving construction "does not mean that the statute will always be constitutional as applied. There may be borderline conduct which would justify a finding of unfitness to teach but about which a teacher would not have a sufficiently definite warning as to the possibility of suspension or revocation." *Id.* 82 Cal.Rptr. at 189 n. 36, 461 P.2d at 389 n. 36.

■ We find nothing in the statutory definition of "unprofessional conduct" which can be said to have adequately warned Tuma of the possibility that her license would be suspended if she engaged in conversations with a patient regarding alternative procedures. Hence, it must be held that the statute, unaided by board rules and regulations, does not prohibit the conduct with which she was charged.

■■ It is important to note also that the void-for-vagueness doctrine is two-pronged. Not only are those whose activities are proscribed entitled to definite standards by which they may be guided, but it is equally important that the standards are there to guide those officers or agencies required to pass judgment on licensees called to account for their conduct. This proposition is properly considered here in regard to the Board's contention

that professional licensing agencies, being made up of professional and experts of the profession regulated, are fit and capable in their own right to determine the standards of the profession from their personal knowledge and experience; thus alleviating the need for extensive expert opinion testimony or other evidence regarding the standards of the profession within the community on each and every occasion for discipline.

We find this contention to be without merit for a number of reasons. The legislature has obviously recognized that the nurses who comprise the Board can, "from their personal knowledge and experience," determine the standards of the profession.[3] And accordingly opportunity was afforded the Board to expand upon the statutory definition of "unprofessional conduct." But, says the Board, it is enough that the Board will hear evidence of a licensee's conduct, and with its expertise then reach a conclusion whether such was or was not unprofessional. We cannot agree. Such a procedure would be an intolerable state of affairs, and not in compliance with requirements of due process.

In *Ex parte McNulty*, 77 Cal. 164, 19 P. 237, 239 (1888), the court expressed concern over the possibility that an individual might lose substantial rights "for the violation of any vague, undefined notion of unprofessional conduct which might, *after the fact*, be entertained by certain individuals constituting a board of examiners." (Emphasis added.) *See Morrison*, 82 Cal.Rptr. at 188 n. 32, 461 P.2d at 388 n. 32. To which must be added that the membership of the Board is a changing thing, and as the Board make-up changes, it cannot be said that notions of

unprofessional conduct may not also change. There must be standards or guides "against which conduct can be *uniformly* judged by courts and administrative agencies." *Id.* 82 Cal.Rptr. at 187, 461 P.2d at 387 (emphasis added).

But here in Tuma's case it was not the Board which found Tuma guilty of unprofessional conduct—rather it was a hearing officer, who, so far as the record shows, was not a nurse, and hence if not a nurse, not possessed of that expertise born of "personal knowledge and experience" which would have enabled him albeit after the fact, to determine from what he heard of Tuma's conduct that she had indeed acted unprofessionally. It was not only Tuma who was at a disadvantage, but the hearing officer as well. For instance, when Tuma asked the Board's Executive Director, who had filed the original petition with the Board, to give a definition of "unprofessional conduct" as applied to a nurse, the following ensued:

MR. MEULEMAN [counsel for the Board]: I object to the question. That interpretation is one for the board hearing officer. It's the *ultimate issue.*

MR. DUFF [counsel for Tuma]: I think it's very important, in this case, that we find out what her definition is of "unprofessional and dishonorable conduct."

MR. MEULEMAN: She is not the one that has to decide whether or not the allegations meet the statute.

MR. DUFF: I am sorry, I don't know what it means. I'd like to find out. I realize that we are talking about an area that, normally, we do not ask the witness. But I understood that part of the Court's ruling was that we were dealing with a

---

**3.** The Board did, at some time prior to Tuma's hearing, promulgate in pamphlet form, Minimum Standards, Rules and Regulations for the Practice of Nursing, which the Board introduced as an exhibit. Rule 602.1(A) states that,

In direct patient care the registered professional nurse shall:

1. Assess and evaluate health status of the individual based upon a thorough understanding of the physiological processes involved, and the emotional needs of the particular individual.

2. Make judgments and decisions regarding patient status and take appropriate nursing interventions.

8. Promote, and participate in, patient education based on the individual's health needs, and involve the individual and family for a better understanding and implementation of immediate and long term goals.

9. Recognize, understand, and respect cultural backgrounds, spiritual needs, and religious beliefs.

person that was trained in this field and should know what those meant.

MR. SNYDER [hearing officer]: Well, if you want her to testify with respect to what she thinks that the items that are contained in the statute and the items that are contained in the rules and regulations, as to what they mean, I am not going to allow it; because I don't know as to why it is relevant as to what the licensee has been charged with. I suppose everyone in this room may have a different interpretation of what that means. But the fact remains that the statute and the regulations define what it is, and I suppose that I am going to be the one that's going to have to decide whether or not the conduct she's charged with comes within the purview of those words.

MR. DUFF: Your Honor, the purpose of my inquiry is precisely to point out precisely the point we are talking about, is how does the registered nurse determine what is unprofessional and dishonorable conduct? And I think that, if it's the Court's ruling that she can't testify to that, that's fine. That's all I want. In my understanding, that is the ruling.

MR. SNYDER: That is the ruling. It is inescapable that the hearing officer felt obliged to hear what Tuma had done, and then, absent any standards appropriate to her particular type of conduct here under fire, to decide whether she was guilty of unprofessional conduct. This feature of the Idaho statute, I.C. § 54–1422(b),[4] sets it apart from any authority relied upon by the Board. The hearing officer—not the Board—makes the initial decision as to guilt or innocence. The Board's only function is

to approve or disapprove a guilty decision, and impose the penalty. It is powerless to enter a decision of its own and specifically cannot find the charges proved if the hearing officer has held otherwise.

The court in *Scott, supra,* did say that "[t]he determination whether by common judgment certain conduct is disqualifying is left to the sound discretion of the board." 244 N.W.2d at 689. But that discretion is not an unbridled one, the court further going on to add "that whether certain acts constitute unprofessional conduct may be established by the testimony of qualified experts." *Id.* at 690. Such was done in *Scott,* but even so, it is important to note also that the licensee in *Scott* was not possessed of a property interest in a license, but was applying for a license to practice nursing—a substantially different posture.

In *Ward, supra,* it is not clear whether the Board there had fulfilled its responsibility of formulating standards, but it appears that the determination of guilt and revocation was made by the board—not a hearing officer. It is clear that the Oregon court held as a matter of law that it is unprofessional for a registered nurse to aid and abet another to serve and perform as a registered nurse, the other person not being so licensed in Oregon, and the statutes of Oregon making it unlawful for an unlicensed person to hold oneself out as a licensed professional nurse. As was said in *Sage-Allen Co. v. Wheeler,* 119 Conn. 667, 678–679, 179 A. 195, 199–200 (1935), the words "immoral," "dishonorable," or "unprofessional" are but general terms indicating the character of conduct which may be grounds for disciplinary action. The court there went on to say:

4. "The board shall appoint some fair minded, disinterested person to serve as hearing officer. . . . After full and mature deliberation, the hearing officer shall make findings of fact and a determination of whether or not the person accused has violated any of the provisions of this section and shall enter the same upon the record of proceedings. After the transcript has been certified, the board shall take the proceedings under advisement and if the board shall approve the findings of the hearing officer that the licensed person

accused has violated any of the provisions of this section, the board shall determine whether the license of such person accused be revoked or suspended and shall enter the order revoking or suspending said license. If the findings of the hearing officer are that there has been no violation of the provisions of this section the board shall notify the licensed person accused and the person making the accusation, and shall dismiss the complaint." I.C. § 54–1422(b).

"These words in themselves have no significance in law even to a reasonable certainty[1] and might seem to authorize the revocation of a license for acts having no reasonable relation to the underlying purpose of the statute, the protection of the public. Giving these words a broad meaning, it would be difficult to justify the grant to the board of power to revoke a license for any conduct which it might deem to be immoral, dishonorable, or unprofessional. [Citations.] But if we did give to these words so broad a meaning, we would be attributing to the Legislature an intent to vest the board with power going beyond the scope of its purposes and to enact a law of at least doubtful constitutionality. We cannot assume that the Legislature intended to give expression to such an intent and must, if it is reasonably possible to do so, so construe the words it has used as to make the provision a valid and reasonable one. [Citations.] The words must have been used in the light of the fundamental purpose of the statutes to regulate the profession in the public interest and they can only be construed as intending to include conduct within their fair purport which either shows that the person guilty of it is intellectually or morally incompetent to practice the profession or has committed an act or acts of a nature likely to jeopardize the interest of the public. So construed, they vest in the board a power it may properly exercise."

The Supreme Court of Arizona, in *Arizona State Board of Medical Examiners v. Clark*, 97 Ariz. 205, 214, 398 P.2d 908, 915 (1965), said this:

[A]s applied in the licensing and revocation cases "unprofessional conduct" has been construed to include serious offense, such as intentional violations of law or recognized professional standards. . .

[T]here must be a "conscious and culpable act amounting to a willful design to do that which is denounced as an unlawful professional practice."

With those cases in mind, we point out again that the Board here has supplied the profession with no definitions of unprofessional conduct. As to the charge here leveled against Tuma, that interference with the doctor-patient relationship constitutes unprofessional conduct, again there are no guidelines—nothing which would provide her with sufficient forewarning as to the possibility of license suspension or revocation. We cannot here see how the hearing officer with a legally founded background could properly conclude that Tuma was guilty of unprofessional conduct.

Nor are we persuaded by the Board's argument that Tuma's guilt could be sufficiently predicated on her own statements that her discussions weren't exactly ethical or legal. Given no written guidelines as to what conduct might possibly result in a suspension of her license for unprofessionalism, Tuma very well may have surmised that she was on thin ice with the particular doctor, or the medical profession in general, in suggesting to a patient alternate procedures for the treatment of cancer. But she could not know, having not ever been forewarned against so doing. Moreover, the Minimum Standards promulgated by the Board seem to support her decision to have such a discussion with the patient.

The judgment of the district court is reversed with directions to enter judgment reversing the order of the Board. Costs to appellant.

SHEPARD, C. J., and McFADDEN, DONALDSON and BAKES, JJ., concur.