683 P.2d 859

Donald E. CORNWELL, SSA 547 50 7052, Claimant-Appellant,

v.

KOOTENAI COUNTY SHERIFF, Employer-Respondent,

and

State of Idaho, Department of Employment, Respondent.

No. 14638.

Supreme Court of Idaho.

June 11, 1984.

---

Eugene A. Marano, Coeur d'Alene, for appellant.

Michael J. Kane, Coeur d'Alene, for employer-respondent.

Jim Jones, Atty. Gen., Lynn E. Thomas, Sol. Gen., and Larry F. Weeks, Deputy Atty. Gen., Boise, for respondent, Department of Employment.

McFADDEN, Judge Pro Tem.

This is an appeal from the Industrial Commission's denial of claimant's request for unemployment compensation. The commission found that claimant was discharged for misconduct and that claimant was therefore not entitled to receive benefits. We affirm.

The applicable provision of the Employment Security Law is I.C. § 72–1366(e), which states in pertinent part:

"The personal eligibility conditions of a benefit claimant are that—

*        *        *        *        *        *

"(e) His unemployment is not due to the fact that he left his employment voluntarily without good cause, or that he was discharged for misconduct in connection with his employment."

We note at the outset the limited nature of this appeal, in that the parties do not dispute the commission's findings of fact. Therefore, the sole issue on appeal is whether the commission correctly applied the above statute to the facts of this case. In summary, the facts are as follows.

Claimant Donald Cornwell worked as a deputy for Kootenai County Sheriff's Office, the employer-respondent herein, from May 1, 1981 to September 18, 1981. He was subject to a one-year probationary period, which had not as yet expired when he was terminated for conduct unbecoming of an officer. The commission determined that the reason for claimant's dismissal was his improper entry into the residence of Mrs. Katie Beebe.

Claimant Cornwell was on duty one day in July 1981, when he was dispatched to pick up a runaway juvenile at a "blue house somewhere at the end of Diamond Drive." Cornwell located the house, but upon knocking and ringing the doorbell, he got no response. He went next door and

inquired of the neighbor, Beebe, who confirmed that the juvenile was at the other house. After apprehending the runaway, Cornwell discovered his police car would not start, and after he asked Beebe for assistance, using "jumper cables," they got the car started.

Claimant returned to Beebe's house on about September 4, 1981 at 1:30 a.m. and noticed Beebe's car keys were in the ignition and the house door was ajar. He knocked, waking Beebe, and requested that she put the car in the garage and lock the house, which she did. They visited a few moments and, following a call from dispatch, he left. Beebe gave him an invitation for a cup of tea, and he returned at 5:30 a.m. and visited with her for a half-hour.

Later, while on patrol, claimant kept an eye on Beebe's house, testifying that he felt protective of her because she was a single woman with children. On September 11, 1981, as he went by her house at about 11:00 p.m., he noticed the lights were on and the garage door open. He tried to close the garage door and could not, so he went to the front door and knocked. No one answered. He went to the side door, which led from the garage into the kitchen, and knocked. Still getting no response, he tried the side door and found it unlocked. He entered the house, and he was about fourteen steps inside and going up the stairs when Beebe's daughter called out that someone was in the house. Mrs. Beebe asked from her bedroom who was there, and Officer Cornwell replied, stating who he was and that the garage door was open and the house unlocked. He then left. Beebe complained to the sheriff's office the next day. Claimant testified that, prior to entering the Beebe home, he neither radioed headquarters, requested a backup officer, nor recorded the stop at the Beebe home in his log book. The evidence indicated there had been no unusual crime in the area. It was not uncommon for garage doors to be left open at night.

The sheriff's department set up surveillance of the Beebe home but did not see Officer Cornwell return to it. The department investigated the incident and dismissed Cornwell from employment, for conduct unbecoming of an officer.

Cornwell filed his claim for unemployment compensation. After a hearing before an appeals examiner of the Department of Employment (D.O.E.), claimant's request for benefits was denied, the examiner ruling that claimant was dismissed for misconduct.

Claimant appealed from the examiner's decision to the Industrial Commission. Following a further hearing before the referee of the Industrial Commission, the referee recommended findings of fact, conclusions of law, and a proposed order affirming the decision of the appeals examiner of the D.O.E.

The Industrial Commission reviewed the record and the referee's proposed findings, conclusions, and order and adopted them as the decision of the commission, from which order this appeal was perfected.

■ Our review of Industrial Commission decisions is limited to questions of law. Factual findings reached by the commission in unemployment cases will not be overturned by this Court unless they are not supported by substantial and competent evidence. *Parker v. St. Maries Plywood,* 101 Idaho 415, 614 P.2d 955 (1980); *Jenkins v. Agri-Lines Corp.,* 100 Idaho 549, 602 P.2d 47 (1979); *Harris v. Green Tree, Inc.,* 100 Idaho 227, 596 P.2d 99 (1979); Idaho Const. art. 5, § 9. The determination of whether a claimant's actions were a deliberate disregard of the standards of behavior which the employer has a right to expect from its employees is a factual one. *Watts v. Employment Security Agency,* 80 Idaho 529, 335 P.2d 533 (1959). In determining whether an employer's actions are tantamount to "misconduct" in the context of the facts of a particular case, we have deferred to the expertise and experience of the Industrial Commission. *See, e.g., Parker v. St. Maries Plywood,* 101 Idaho 415, 614 P.2d 955 (1980); *Jenkins v. Agri-Lines Corp.,* 100 Idaho 549, 602 P.2d 47 (1979); *Watts v.*

*Employment Security Agency,* 80 Idaho 529, 335 P.2d 533 (1959).

■ In *Johns v. S.H. Kress & Co.,* 78 Idaho 544, 548, 307 P.2d 217, 219 (1957), this Court explained the meaning of misconduct, as used in I.C. § 72–1366(e), as follows:

"While the term 'discharged for misconduct' as used in Sec. 72–1366(f) [now (e) ], I.C. has been variously defined, we think the term should be interpreted as meaning wilful, intentional disregard of the employer's interest; a deliberate violation of the employer's rules; or a disregard of standards of behavior which the employer has a right to expect of his employees."

In this case, the record supports the finding that the employer reasonably expected its officers to refrain from entering private homes uninvited and without cause, and that claimant inexcusably violated that standard of conduct. We affirm the commission's denial of benefits, on the limited basis of the third standard of the *Johns* definition of misconduct, *i.e.,* that there was substantial, competent evidence of "a disregard of standards of behavior which the employer has the right to expect of his employees." *See also Matthews v. Bucyrus-Erie Co.,* 101 Idaho 657, 619 P.2d 1110 (1980).

The decision of the Industrial Commission is affirmed. Costs to respondents.

DONALDSON, C.J., and BAKES and HUNTLEY, JJ., concur.

BISTLINE, Judge, dissenting.

The decision of the Department's appeals examiner was based on the following set of facts, and the following conclusion:

"The evidence in the record established the claimant had several years experience in law enforcement before becoming employed by the interested employer. During the course of his employment, he made repeated visits to a particular residence. The occupant complained to the employer after the claimant entered the premises uninvited. That action resulted in the claimant's separation, and it is deemed a willful, intentional disregard of the employer's interests or standard of behavior which the employer has the right to expect of an employee. It is therefore concluded misconduct has been established."

R., Vol. 3, p. 2.

The decision of the Commission's referee (in turn adopted by the Commission as its decision) was decidedly more fair to claimant in its Findings of Fact II–VI, the first part of VII,[1] and VIII. The second part of

1.

"II.

"After a training period, the claimant was assigned to patrol duty. In about late July of 1981, the claimant was dispatched to find a runaway juvenile. He found the house where he believed the juvenile was staying, but no one answered when he knocked. He went next door to a house occupied by Katie Beebe. She directed the claimant back to the house where he had been. He returned, knocked harder, and eventually arrested the juvenile. But after he arrested the juvenile, his car would not start so he went back to the Beebe residence for assistance. With her help, the claimant 'jump' started the car and then took the juvenile to the station.

"III.

"Generally, the claimant worked on the graveyard shift from 11:00 p.m. to 7:00 a.m. One evening sometime after the incident involving the runaway juvenile, the claimant was driving by the Beebe residence and he noticed that the door was ajar. He knocked on the door and woke Ms. Beebe. The claimant told her that the door was ajar. It would not close because the

screws on one of the hinges were loose so the claimant tightened them. He talked with Ms. Beebe for a few minutes before he received a call and had to leave. Ms. Beebe suggested that he stop by again so he did so when he had finished the call. Ms. Beebe invited him inside and they talked for about 20 minutes. They talked about such things as the claimant's religion, their children, and scouting.

"IV.

"The claimant testified that he felt protective toward Ms. Beebe because she was a single woman with children. One evening the claimant was driving by her house and he shined his spotlight on the house as a security check. The claimant felt that most people appreciated it when he checked their property in that manner. On another occasion, he found Ms. Beebe's car parked outside her home with the keys in the ignition. He woke her and had her put the car into the garage and lock the garage.

"V.

"On the night of September 11, 1981, the claimant was driving by the Beebe residence

VII, however, is very offensive to notions of fair play:

"At about the time that the claimant was discharged, the sheriff's office learned that about $200.00 was missing from an arrest in which the claimant was involved. There is no evidence in the record that the claimant took the money. But the .claimant was not discharged as a result of the missing money or poor penmanship; he was discharged because he improperly entered Ms. Beebe's house."

The very fact that this statement was made of record demonstrates at the least that the referee was unduly influenced by a factor which had no proper place in his decision. He might have as well stated that there were a number of unsolved rape incidents while claimant was on shift, adding only that there was no evidence in the record that claimant was the culprit. How much the referee's statement influenced the Commissioners, and how much it influences the Justices is beyond accurate appraisal. Because it cannot be said to be inconsequential error, at the least I would vacate the decision of the Commissioners with directions that the Commission itself review the record and afford all of the parties the opportunity to be heard before it.

Although the inclusion of that statement by the referee could not help but prejudice the claimant in the eyes of the Commissioners and the members of this Court, I do not intimate that it was done with that intention. There appears to be no reason to suggest that it was willfully done. The referee, unlike the Commissioners and the Justices, had the benefit of a first hand evaluation of claimant. Disproving any bad intent on the part of the referee is his finding set out in Conclusion III that *"The Referee is satisfied that the claimant's attentions toward Ms. Beebe were not maliciously motivated."*

But the referee nevertheless made the ultimate conclusion that:

"[B]ecause the claimant's conduct fell below the standards which the employer could reasonably expect, his conduct constitutes a disregard of the standard of behavior which the employer had a right to expect of its employees. Thus, the claimant's unemployment is due to the fact that he was discharged for misconduct in connection with his employment, so he is not eligible for unemployment benefits."

A significant problem with this standard is its vagueness, and also the facts which the referee perceived as bringing that standard into play. By Finding VIII the referee established only that claimant "had been given copies of court cases which indicated that officers should not enter a house without a warrant, but the claimant interpreted that information as being concerned with

---

and he saw that the garage door was open and the light on. It was an electrically controlled garage door. The claimant attempted to close it, but nothing happened when he pushed the button. He then went to the front door and knocked but no one answered. He then decided to check to see that the doors to the house were locked. He found that the front door was locked but the door into the house from the garage was not locked and he was unable to lock it. The claimant then returned to the front door and knocked again in an attempt to waken someone, but still no one answered. The claimant then went back to the garage and opened the unlocked door to the house. He said 'Hello', but there was no answer and he entered the house. He went about 14 steps into the house and was on the stairs when Ms. Beebe called out from her bedroom asking who was there. The claimant identified himself as a deputy and informed her that the garage door was open and that the door to the house from the garage was unlocked. He then left. He did not return to the Beebe residence because he felt that she was not concerned about security.

"VI.

"When the claimant entered the Beebe residence on September 11, he was not aware of any crime in that area during the previous six months. It was not unusual for residents in that area to leave their garage doors open at night.

"VII.

"After the claimant entered her house on September 11, Ms. Beebe complained. The sheriff's office investigated the matter and the claimant was discharged on September 18, 1981 for conduct unbecoming an officer because he had improperly entered Ms. Beebe's house. Until that time, the claimant had been performing his job satisfactorily; he had been told to work on his penmanship but he had performed satisfactorily otherwise."
R., Vol. 3, pp. 6–7.

entry of homes while making an arrest." As a conclusion, the referee conceded that "the claimant's interpretation may be technically correct." But, then, the referee comes up with a proposition of constitutional dimensions: "[T]he principle enunciated by such cases and by the Constitution is that citizens shall be free from unwarranted intrusions into their homes by police officers and other government officials." From that lofty vantage point the conclusion is easily reached that the Kootenai County Sheriff's Office could expect of its officers that they "will not enter citizen's houses without an invitation in the middle of the night, in the absence of some indication that a crime has been, is being, or is about to be committed." Apparently this line of reasoning persuaded the Commission, and now convinces a majority of this Court. However, this was *not* a criminal case wherein at stake is the suppression of evidence because of an unlawful entry. Nor can it be said on this record that claimant's concern aroused because of Ms. Beebe's lax security, and her previous receptiveness to his actions, were not tantamount to an implied invitation to continue. (Did not the referee specifically declare to his satisfaction that the claimant's attentions were not maliciously motivated?) All that can be deduced here is, then, that the claimant was, and is, denied benefits because the Kootenai County Sheriff, from *his* reading of search and seizure cases, did not expect that his officers would perceive that their function included preventive security measures. To fasten a denial of benefits in this case on so slender a reed is a clear case of over-kill. Contrary to what is apparently now the view of the Commissioners and a majority of the justices, absent ulterior motives, and here there were none, I would have thought that although minds would differ on the appropriateness of claimant's actions, it is unfair to declare those actions as constituting misconduct on the basis of the sheriff's interpretation, after the fact, of expected standards of behavior.

Sheriff Stalder, on examination by claimant's attorney, was asked about standards set out in the policy manual:

"Q. (By Mr. Marano) Do you have a manual that sets out what deputies are expected to do?

"A. There is a policy manual, yes.

"Q. There's a policy manual. How large a document is that?

"A. Numerous pages.

"Q. Okay. And it has do's and don'ts in there?

"A. Yes.

"Q. Is one of the don'ts in that policy manual, 'Don't go to a lady's house unless she asks you to go'?

"A. I don't believe that would be included in there.

"Q. Okay. Is one of the don'ts in there, 'Don't let unauthorized people go in your patrol vehicle'?

"A. Yes."

. . . .

"Q. (By Mr. Marano) What standards of behavior do you expect from your deputies?

"A. Standards of behavior?

"Q. That's right.

"A. To conduct themselves in a manner that's professional.

"Q. What does 'professional' mean to you?

"A. It means—again, as I said before—conducting yourself in a manner that's acceptable to society . . .

"Q. Um-hum.

"A. . . . and to the county employment as a police officer or a deputy sheriff.

"Q. And, what does that mean?

"A. Well, there's certain things that you can do as a deputy sheriff in a professional manner. There's certain things you can do in an unprofessional manner. If you're unprofessional, then you shouldn't be employed, depending on the circumstances; and I suppose I could go on for hours and explain that."

. . . .

"Q. (By Mr. Marano) What do you expect of your employees? You say, 'professional behavior.' What is, 'professional behavior' to you, how are those communicated to your employees?

"Let me ask you that. Your definitions of 'professional behavior,' how are those communicated to your employees, probationary deputies? Do they get that through the policy manual?

"A. They have that. They have the training program that's available, the Post Academy, to train them on how to conduct themselves as a deputy.

"Q. Okay. Let me ask you this: Did Deputy Cornwell go to the Post Academy?

"A. He had prior training in California.

"Q. I see. So, what you're telling me is that if he had prior training in California, then you would rely upon that training to establish his level of professionalism? Is that correct?

"A. That, and I think it also goes further, that you can also expect common sense to enter into any type of duties that you're doing, and you have to rely on that individual to have that common sense.

"Q. Okay. So, now it's a combination of experience, whatever he was taught in his prior employment, in this particular case; also, common sense, and the policy manual. What else is there that the deputies are communicated with as to what they are expected to follow as far as standards of behavior?

"A. Well, their briefings to their supervisors. I suppose that about includes it all.

"Q. That's it. That's how they come to their standards of behavior? You do not communicate that to your deputies in any other way as the sheriff?

"A. I guess not."

Tr., pp. 30–36.

On previous occasions I have voiced considerable disenchantment with the *Johns v. S.H. Kress* case. It had been hoped that one day this Court might take the time to examine the validity of that 3–2 decision, and its definition of misconduct which was created solely in order to form a predicate for reversing a contrary decision of the Commission which awarded benefits. I submit that now, almost thirty years later, that part of the *Johns* definition which the Court today utilizes cannot be allowed to stand against our *unanimous* decision in *Tuma v. Board of Nursing,* 100 Idaho 74, 593 P.2d 711 (1979). In that case the professional was a nurse. In this case it is a peace officer. That which we said in *Tuma* is equally applicable here, and it would seem more so, because in *Tuma* there was at least a statute which provided for revocation of a license upon proof that a licensee was guilty of unprofessional conduct, but without any definition of that phrase applicable to Tuma's case. 100 Idaho at 78, 593 P.2d at 716. The argument raised against Tuma was that unprofessional conduct "is that which is recognized to be unsafe or improper by the profession itself." We disagreed there, and we should be equally loathe to perpetuate that much of the *Johns* standard of disqualifying misconduct as allows for an after-the-fact declaration of that which was supposedly unprofessional on the part of this claimant.

In reviewing this case, there is reason to wonder how much attention was given to the fact that the claimant, and his wife and children, have been needlessly subjected to the innuendo that he made off with $200, and to the further fact that there is in the record evidence of two polygraph tests to which the claimant subjected himself in order to clear his name. *See* attached Claimant's Exhibit Concluding with a final note, it is observed that initially the County did not protest this claim. After the claim had been approved there was an appearance filed with the Department which this Court should not lightly ignore. The Gibbens Company, purporting to act on behalf of Kootenai County, entered upon the scene, declaring in its protest that "Investigation is still pending on the alleged theft of $200.00." This is the same Gibbens Company which caught the Court's atten-

**830**

tion in *White v. Forest Industries*, 98 Idaho 784, 788, 572 P.2d 887, 891 (1977). At the hearing before the appeals examiner, according to the R., Vol. 3, p. 1, the Gibbens Company appeared and examined witnesses.

APPENDIX

# CRIMINALISTICS CENTER
### NORTH IDAHO COLLEGE
1000 W. GARDEN AVENUE • COEUR D'ALENE, IDAHO 83814
208-667-6831

CLAIMANT'S EXHIBIT

To:    Don Cornwell
29 Coeur d'Alene Drive
Spirit Lake East, Idaho    83869

From:    Wallace J. Young, Criminalist
North Idaho College

Sub:    Polygraph examination of Don Cornwell

Date:    October 19, 1981

On October 19, 1981, a polygraph examination was administered to Don Cornwell.

The following relevant questions were asked Don and his responses were as follows:

    1.  Is your last name Cornwell?    ANS: YES

    2.  Have you had sexual intercourse with anyone besides your wife since starting to work for Kootenai County Sheriff's Office?
        ANS: NO

    3.  Do you go to Katies house for any reason other than police business or public relations?
        ANS: NO

Mr. Cornwell appeared to be truthfull in his responses.

There was a slight deviation in question number 3, but not enough to call it deceptive.

Respectfully,

Wallace J. Young, Criminalist

WJY/bjs

cc

# CRIMINALISTICS CENTER
## NORTH IDAHO COLLEGE
1000 W. GARDEN AVENUE • COEUR D'ALENE, IDAHO 83814
208-667-6831

To:     Don Cornwell
        29 Coeur d'Alene Drive
        Spirit Lake East, Idaho    83869

From:   Wallace J. Young, Criminalist
        North Idaho College

Sub:    Polygraph examination of Don Cornwell

Date:   November 10, 1981

On October 8, 1981, a polygraph examination was administered to Don Cornwell of Spirit Lake East, Idaho.

The following relevant questions were asked Mr. Don Cornwell and his responses were:

1. Did you take $200.00 from anyone during your time with Kootenai County Sheriff's Office?

                                    ANS:  NO

2. Did you help anybody take any money from anyone during your time with Kootenai County Sheriff's Office?

                                    ANS:  NO

3. Do you know who took that missing money while you were working at Kootenai County Sheriff's Office?

                                    ANS:  NO

No deception patterns were noted on the above questions.

Respectfully,

Wallace J. Young, Criminalist

WJY/bjs

cc