793 P.2d 181

**Ron MOOSMAN and Virgil Allred, Petitioners–Respondents, Cross–Appellants,**

v.

**IDAHO HORSE RACING COMMISSION, Respondent–Appellant, Cross–Respondent.**

**R.L. GALLOWAY, C. Kent Seeley, and Cloyd D. Seeley, Petitioners–Respondents, Cross–Appellants,**

v.

**IDAHO HORSE RACING COMMISSION, Respondent–Appellant, Cross–Respondent.**

Nos. 17771, 17772.

Supreme Court of Idaho.

May 1, 1990.

Petition for Rehearing Denied July 10, 1990.

---

Elam, Burke & Boyd, Boise, for appellant. Bobbi K. Dominick, argued.

Ringert, Clark, Harrington, Reid, Christenson & Kaufman, Boise, for respondents. James G. Reid, argued.

JOHNSON, Justice.

This case involves a decision of the Idaho Horse Racing Commission to impose penalties on the owners and trainers of two race horses. On appeal the district court reversed and set aside the penalties on the ground that the rule upon which the Commission relied was unconstitutionally vague. As to the owners, we decline making a ruling on the constitutional question, because we conclude that under the Commission's rules there was no basis to redistribute the purses. As to the trainers, we conclude that properly interpreted the rule is not unconstitutionally vague. We also hold that the owners were entitled to attorney fees in the district court and on this appeal. We affirm the district court's denial of attorney fees to the trainers.

## I.

### THE BACKGROUND AND PRIOR PROCEEDINGS.

Ron Moosman was the trainer and Virgil Allred was the owner of a race horse known as Dee Dee Red. R.L. Galloway was the trainer and Galloway, C. Kent Seeley and Cloyd D. Seeley were the owners of a race horse known as Tequila Time. Dee Dee Red and Tequila Time both raced at Les Bois Park on June 27, 1987. Dee Dee Red finished first in one race. Tequila Time finished second in another race. Following the races a urine sample was taken from each horse. On July 4, 1987, both horses raced in the Western States Futurity at Les Bois Park. Dee Dee Red finished first. Tequila Time finished sixth.

On July 8, 1987, test results of the samples taken on June 27, 1987, indicated that each horse had polyethylene glycol (PEG) in its system. Moosman and Galloway then received notices summoning them to formal hearings before the board of stewards at Les Bois Park. In Moosman's no-

tice the subject of the hearing was stated to be: "RULE # 725–PROHIBITED SUBSTANCE, POLYETHYLENE GLYCOL: FOUND IN TEST OF HORSE 'DEE DEE RED.'" Galloway's notice was identical, except it referred to "TEQUILA TIME."

Rule 725 of the Commission provided:

If the Stewards find that any non-approved medication which, for the purpose of definition shall include any drug, chemical, narcotic, anaesthetic, or analgesic has been administered to a horse in such a manner that it is present in a pre-race test or post-race test sample, such presence shall constitute prima facie evidence that the horse has been illegally medicated.

Following hearings on July 22, 1987, the board of stewards fined each trainer $300.00 and placed each on probation for one year. The stewards also disqualified both horses from the races on June 27, 1987, and ordered that the owners of the horses not share in the purse of the Western States Futurity and that the purses for all these races be redistributed. Both trainers protested the decisions of the stewards, and hearings were conducted before one member of the Commission, acting as a hearing officer. At the hearings, neither trainer contested the test results. They did question the severity of the penalties, especially the redistribution of the purses. Following the hearings, the full Commission affirmed the decisions of the stewards. The trainers and the owners then petitioned the district court for review of the Commission's decision.

In their petitions the trainers and owners alleged that the decisions of the stewards were in violation of both constitutional and statutory provisions, were in excess of the Commission's statutory authority, were arbitrary and capricious and an abuse of discretion by the Commission. The district court concluded that Rule 725 is unconstitutionally vague, both facially and as applied in these cases, and reversed and set aside the stewards' findings and the penalties imposed. The district court found it unnecessary to address the other alleged errors.

The trainers and owners requested attorney fees for prosecuting the appeal to the district court. The district court denied the award of attorney fees under I.C. § 12–117 on the grounds that although the Commission was mistaken both in its procedure and its decision, the mistakes were reasonable, the Commission's actions and decisions were not arbitrary, unreasonable or groundless and the charges were not groundless.

The Commission appealed from the district court's order reversing and setting aside the stewards' findings and imposition of penalties. The trainers and owners cross-appealed from the denial of attorney fees.

II.

THERE WAS NO AUTHORITY TO REDISTRIBUTE THE PURSES FOR A VIOLATION OF RULE 725.

■ The Commission asserts that Rule 725 is not unconstitutionally vague. We find it unnecessary to address this issue with regard to the owners. We conclude that the stewards and the Commission did not have the authority to redistribute the purses for a violation of Rule 725.

The only ground that was cited by the stewards for the redistribution of the purses was a violation of Rule 725. The rule itself did not include any provision for a penalty. Rule 726 provided:

The penalty for violation of any part of this section, unless otherwise provided, shall be a fine of not to exceed five hundred dollars ($500), suspension for a fixed or indeterminate time, or both.

The section referred to in this rule is section seven of the Commission's rules, which is entitled "Illegal Practices and Permitted Medication." Clearly, Rule 726 does not authorize the redistribution of purses for a violation of Rule 725.

In its decision in Galloway's case the Commission stated that the stewards had cited Rule 718 in ordering the purse awarded to Tequila Time for finishing first in the race on June 27, 1987, to be redistributed. However, we find no reference to Rule 718

in the stewards' decision. In any event, Rule 718 was not authority for the redistribution of a purse because of a violation of Rule 725. Rule 718 provided:

The owner or owners of a horse found to have been administered drugs in *violation of the foregoing rules* shall be denied, or shall promptly return, any portion of the purse or sweepstakes and any trophy in such race and the same shall be distributed as in the case of a disqualification. If a horse shall be so disqualified, the eligibility of other horses which ran in such race and which have started in a subsequent race before announcement of such disqualification shall not be in any way affected. (Emphasis added)

Rule 725 was not one of the rules that was "foregoing" to Rule 718. Instead, it followed Rule 718. Rule 716 was "foregoing" to Rule 718. Rule 716 set forth a list of violations in the administration of medications to race horses. Neither the trainers nor the owners were charged with a violation of Rule 716. Therefore, there was no basis for redistributing the purses and depriving the owners of their winnings.

### III.

### RULE 725 IS NOT CONSTITUTIONALLY VAGUE.

■ As to the trainers, we interpret Rule 725 to provide sufficient certainty to avoid its being constitutionally vague.

In *Pence v. Idaho State Horse Racing Commission*, 109 Idaho 112, 115–16, 705 P.2d 1067, 1070–71 (Ct.App.1985), our Court of Appeals considered the vagueness of another rule of the Commission. The Court of Appeals stated the standard that should be applied to determine the constitutionality of the rule:

Substantive due process prohibits imposition of penalties for violations of rules or statutes that do not convey sufficiently definite warnings as to proscribed conduct, thus leaving persons of common intelligence to guess at what is prohibited. *E.g., Wyckoff v. Board of County Commissioners of Ada County*, 101 Idaho 12, 607 P.2d 1066 (1980).

This standard is compatible with the pronouncements of this Court in *Tuma v. Board of Nursing*, 100 Idaho 74, 593 P.2d 711 (1979). There, we reversed the suspension of the license of a nurse who had been charged with "unprofessional conduct," which was a statutory ground for suspension. The nurse was alleged to have interfered with the relationship between a physician and a patient by discussing alternative treatments with the patient. In finding that the statutory term "unprofessional conduct" was unconstitutionally vague, we said:

We find nothing in the statutory definition of "unprofessional conduct" which can be said to have adequately warned Tuma of the possibility that her license would be suspended if she engaged in conversations with a patient regarding alternative procedures. Hence, it must be held that the statute, unaided by board rules and regulations, does not prohibit the conduct with which she was charged.

*Id.* at 80, 593 P.2d at 717.

Under the statutes establishing the Commission and granting to the Commission the authority to license those participating in race meets, the Commission is given the power to promulgate rules and regulations with which licensees must comply. I.C. § 54–2506 (1988). Reading the rules of the Commission together in order to ascertain their meaning, we conclude that Rule 725 is not merely an evidentiary rule. Although it speaks in terms of providing a means for the stewards to prove a prima facie case that a horse has been illegally medicated, in effect, it is a substantive, prohibitory rule.

Reading Rules 716 and 725 together provides a constitutionally sufficient meaning to the term "non-approved medication" used in Rule 725. The key to understanding how these rules work together is to recognize that Rule 716 provides the means by which medications may be approved. For instance, the rule provides that non-steroidal anti-inflammatory drugs may be approved in writing by the Commission veterinarian. The rule provides for a

"Non–Steroidal Anti–Inflammatory Drug Request Form" that is to be submitted to the Commission veterinarian. The rule also provides for the expiration of the approval for the use of approved medication. The rule lists the four non-steroidal anti-inflammatory drugs that are permitted. Epistaxis treatment for horses that are bleeders is permitted by the rule as a race day medication "provided that written approval of the Commission Veterinarian is obtained prior to race day treatment on the Medication Request Form." The only epistaxis treatment permitted under the rule is premarin.

This leads us to conclude that any medication that is present in a pre-race or post-race test sample, except those that have been approved by the Commission veterinarian as provided in Rule 716, constitutes not just prima facie evidence that the horse has been illegally medicated, but proves the violation itself. This interpretation is strengthened by a reading of Rule 2802, which states:

> The Trainer shall be the absolute insurer of and responsible for the condition of the horses entered in a race regardless of the acts of third parties. Should the analysis of blood or urine samples or tests of other materials prove positive, showing the presence of any chemical or drug of any kind or description, *except as permitted in Rule 716*, the Trainer of the horse shall be fined, suspended or both. (Emphasis added.)

Medications that are permitted by Rule 716 are those that have been approved in writing by the Commission veterinarian. Any other medications are "non-approved medications" as referred to in Rule 725. Once it has been proved that a medication that has not been approved in writing by the Commission veterinarian is present in a horse, the trainer must be penalized. There is no vagueness as to the meaning of "non-approved medications." If there isn't written approval by the Commission veterinarian, the medication is non-approved. This gives certainty to the meaning of "non-approved medication" as contained in Rule 725.

■ We are unable to accept the validity of the example used by the district court to demonstrate the vagueness of Rule 725. The district court reasoned:

> To push the regulation to its logical extreme, it could be argued that a test sample showing the presence of water in a horse's urine would establish a violation of Rule 725. Water is a chemical. It is not listed in the regulations as an approved medication. Medication is defined as a drug, *chemical,* narcotic, anesthetic, or analgesic. The administration, withholding, or over-administration of water to a horse unquestionably will effect its racing condition. It would be surprising indeed if a sample of horse urine did not test positive for the presence of water. Nevertheless every positive test would be "prima facie evidence that the horse had been illegally medicated." (Emphasis in original).

The fallacy in this hypothetical case is that while water is composed of chemical elements, it is not a "chemical" as referred to in Rule 725.

A chemical is "a substance (as an acid, alkali, salt, synthetic organic compound) obtained by a chemical process, prepared for use in chemical manufacture, or used for producing a chemical effect." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 384 (3d ed. 1969). We note also that our legislature has indicated by its use of the word "chemical" in several statutes that water should not be considered to be a "chemical." *E.g.,* I.C. § 22–1001 (Supp.1989) (The use of chemicals is one of the crop management practices applied to produce crops that are free from pests, disease or other detrimental influence); I.C. § 37–314(7) and (9) (1977) (Milk is deemed to be adulterated when it has been diluted with water or a "foreign chemical"); I.C. § 39–1608 (1985) (Chemicals shall not be used to preserve food in public eating places); I.C. § 39–1806 (1985) (Chemical fire extinguishers must be provided in every hotel); I.C. § 39–4429 (1985) (The Department of Health and Welfare may enter a hazardous waste facility or site and inspect the hazardous wastes or

other chemicals contained there); I.C. § 48–509 (1977) (Among the classes of goods listed separately under the trademark act are chemicals and carbonated water).

We conclude that water is not a chemical within the meaning of "non-approved medication" in Rule 725.

## IV.

## THE OWNERS ARE ENTITLED TO ATTORNEY FEES.

█ The owners assert that they should have been awarded attorney fees by the district court. We agree.

I.C. § 12–117(1) (Supp.1989) provides:

In any administrative or civil judicial proceeding involving as adverse parties a state agency and a person, the court shall award the person reasonable attorney's fees, witness fees and reasonable expenses, if the court finds in favor of the person and also finds that the state agency acted without a reasonable basis in fact or law.

Because of our ruling that the Commission had no authority to order the redistribution of a purse for a violation of Rule 725, we conclude that the Commission acted without a reasonable basis in fact or law. We remand this part of the case to the district court for an appropriate award of attorney fees to the owners.

## V.

## CONCLUSION.

We affirm the district court's reversal of the decision of the Commission ordering the redistribution of the purses. We reverse the district court's denial of attorney fees to the owners and remand for setting the award.

We reverse the district court's order reversing the decision of the Commission imposing penalties on the trainers. We affirm the district court's denial of attorney fees to the trainers.

We award costs and attorney fees to the owners on this appeal. We award costs to the Commission against the trainers on this appeal.

BAKES, C.J., and BOYLE and McDEVITT, JJ., concur.

BISTLINE, Justice, concurring in part and dissenting in part:

While I am basically in accord with the substantive analysis of the majority opinion in this case, a brief mention of the dicta concerning the chemical properties of water is in order. Laying no claim to being a chemist, I cannot state with certainty that water is or is not a chemical. However, that the majority has seen fit to make such a determination without a request from the parties to do so and without briefing on the issue is a source of concern. The question of water's chemical status may squarely confront us some day. Until that time, the issue is best left unresolved.

I also cannot concur with the majority's views concerning the award of attorneys' fees. It used to be that an award of attorneys' fees was a sanction reserved for conduct on the part of an attorney or a party which was particularly egregious, or an award would be made as a means of insuring that an injured party's award was not substantially reduced through the payment of fees. Now, however, awards of fees are almost commonplace—all too frequently, so it seems, if litigants lose, they not only pay their own attorneys' fees, they pay those of opposing counsel as well. Clearly the courts are not as "open" as the framers of the Constitution intended that they be.

If these awards of fees are intended as sanctions, then the opinions that make the awards should explicitly define what conduct is being sanctioned. If, on the other hand, as is suspected, the increase in attorneys' fees awards is an attempt to reduce the amount of litigation perceived to be overwhelming our court system, that use is inappropriate. There are other means of reducing litigation which are more direct, more forthright, and probably more effective than awarding attorneys' fees against losing litigants. As was recognized by two members of the Court in *Minich v. Gem State Developers, Inc.,* 99 Idaho 911, 919,

591 P.2d 1078, 1086 (1979) (Donaldson, J., concurring and dissenting, and Bistline, J., concurring), this Court has neither inherent nor statutory authority to award attorneys' fees on appeal. The sooner the Court recognizes that fact and restricts its awards of fees to the clear confines of the statute, the better.