IN THE MATTER OF NICHOLAS D. INTROCASO, JR., A
MEMBER OF THE BAR.

Argued March 3, 1958—Decided March 31, 1958.

354 

*Mr. Raymond G. Betsch* argued the cause for the committee.

*Mr. Alfred Brenner* argued the cause for the respondent.

The opinion of the court was delivered by

FRANCIS, J. The respondent Nicholas D. Introcaso, Jr., is a member of the bar of this State and practices law in Jersey City, New Jersey. The Ethics and Grievance Committee of Bergen County, after a number of hearings, found him guilty of violating *Canons* 27, 28, 34 and 22 of the *Canons of Professional Ethics* and presented the matter to this court for disciplinary action.

These canons declare that it is unprofessional for a lawyer to solicit employment through "touters" (*Canon* 27); that it is "disreputable" to "employ agents or runners" to bring or to influence the bringing of cases to his office (*Canon* 28); and that it is improper to divide "fees for legal services, * * * except with another lawyer, based upon a division of service or responsibility" (*Canon* 34). *Canon* 22 requires that "the conduct of the lawyer before the Court * * * should be characterized by candor and fairness."

 Tersely stated, the substance of the charge against respondent is that he employed a touter or runner to produce criminal cases for defense by him. The matter was processed before the committee in two distinct stages.

In the first of the two series of hearings, Joseph Miskiewicz, Mrs. Hedwig Nealon and Julius Zeuner gave testimony which pointed to the fact that Introcaso had used a runner to induce them to retain him in criminal cases in which they were interested. Miskiewicz had been arrested in Bergen County on a gambling charge, a minor son of Mrs. Nealon had been held as a material witness in connection with a gas station robbery, and Zeuner's son had been apprehended on charges of breaking and entering. In Miskiewicz' case, the touter employed the name Farrell, and with Mrs. Nealon and Zeuner, the name Mahr. All three (who were not at all hostile to Introcaso) asserted

that after being contacted by telephone, they visited Introcaso's office, where Farrell or Mahr was present at their conferences with Introcaso about their cases. However, there was no express recognition or admission in their presence by Introcaso that Mahr or Farrell was responsible for his being retained. Nor was there any conversation about fee splitting during the witnesses' visits, although in the Zeuner matter some proof appeared as to a later but related transaction which was clearly susceptible of such an inference.

The most significant circumstance that came from the testimony of these witnesses was their identification of the touter. Although they had no connection with each other and, of course, had visited Introcaso's office on different occasions, they gave remarkably similar descriptions of the individual. And the descriptions were such as to leave no doubt that they were speaking of the same man.

Testifying in his own behalf, Introcaso admitted his professional appearances for Miskiewicz, Mrs. Nealon and Zeuner. But he repeatedly and categorically denied knowing a man named Farrell or Mahr, or any one of his description. At one point the description as furnished by the witnesses was given to him and he was asked, "Without regard to the name, do you know any person of such description?" The reply was, "No, I swear on my solemn oath."

He did state, however, that a man of Mahr's description had accompanied Mrs. Nealon when she came to his office but that he had never seen the man before, and thought he was a friend of Mrs. Nealon. He denied that Miskiewicz and Zeuner had been in his office with Mahr, or with any one of that description. He stated also that he had never employed a runner and had never paid any one to bring cases to him.

Further testimony of a corroboratory nature, which need not be detailed here, was offered on both sides of the issue. On September 21, 1956 a presentment was filed finding Introcaso guilty of unethical and unprofessional conduct in using the services of Farrell or Mahr to induce Miskiewicz

and Mrs. Nealon to retain him. But in the Zeuner case, the committee found inadequate proof to support the charge. A determination was also made that there was insufficient evidence to warrant the conclusion that respondent had agreed to pay Farrell or Mahr for his efforts. Finally, the committee recorded its opinion that Introcaso's denial of knowledge of the runner was not worthy of belief. The presentment concluded by submitting the matter for disciplinary action.

After oral argument of the cause on June 10, 1957 this court, on its own motion, directed the Bergen County prosecutor to ascertain, if possible, the identity of the person described by the various witnesses. The efforts of the prosecutor proved successful. He located one John Francis Talty of Jersey City, who appeared to be the man in question, and on September 23, 1957 the record was remanded to the Ethics and Grievance Committee for the purpose of gathering further testimony.

Talty's testimony was taken on October 17, 1957, at the Jersey City Medical Center where he was hospitalized due to a cardiac condition. At that session Talty admitted that he had been a runner or touter for Introcaso in criminal cases under an agreement whereby he had received one-half of the legal fees arising from cases produced by him. He conceded also that he had solicited Miskiewicz, Mrs. Nealon and Zeuner to retain Introcaso, and that he had shared the fees paid by them. In fact, he testified that over the period of his association with respondent he had brought in about 70 criminal cases and had been paid his proportionate share of each fee.

Talty is 57 years of age and resides with his mother, Mrs. Margaret Farrell, in Jersey City. Farrell is his mother's name by her second marriage. The name of her first husband (the witness' father) was Talty. Her maiden name was Mahr. Thus, the family history explains the aliases.

Prior to his illness, Talty's occupation had been soliciting accident and criminal cases for lawyers. He has a long criminal record, including convictions for impersonating an

officer, entering and larceny, as a disorderly person, obtaining money under false pretenses, and attempted false pretenses. Two of the convictions as a disorderly person were for ambulance chasing.

He testified that he first met Introcaso (who was present at the hearing and whom he identified) 25 or 26 years ago when respondent was serving his clerkship with a criminal lawyer in Jersey City. However, they were never very well acquainted until they met casually on the street in the vicinity of Hudson County Court House "about three years ago." At that time, Introcaso mentioned that he specialized in immigration and criminal cases; he asked Talty to solicit such matters for him but specifically said that he did not want any accident cases. Thereafter, Talty went to Introcaso's office where arrangements were made for the division of fees.

In the course of their dealings, Talty recollected having procured six immigration matters in Hudson County, and an unspecified number of cases in Essex, Union, Bergen and Mercer Counties. Particular mention was made of a murder case in Union County in which Introcaso pleaded his client guilty; a murder case in Lake George, New York, where the defendant received a ten-year sentence, and an armed robbery indictment in Mercer County. In later testimony, Introcaso admitted representing a defendant on an armed robbery charge in Mercer County. And at the oral argument before this court, he conceded having had a murder case in Union County in which his client had pleaded· guilty, and another such case in Lake George where the sentence was ten years, and in which he said he acted only as forwarding attorney.

Talty described himself as he was before the cardiac attack (he had lost approximately 100 pounds) and the description accorded with that given by the witnesses in the earlier proceedings. In fact, a police photograph of him taken in 1952 was introduced which confirmed their statements on the subject. He testified also that Introcaso knew him as Talty and Farrell but not as Mahr; and further that on

one occasion around 1955 respondent warned him that the Bergen County Prosecutor's Office was looking for him on a charge of soliciting cases and told him to keep out of sight.

Moreover, Talty exhibited a rather accurate knowledge of the interior of Introcaso's office; he remembered the secretary's maiden name as Eileen Canavan (given later by Mrs. Introcaso as Cannon) and knew that she had married. He knew Mrs. Introcaso's first name as Virginia; that they had two married sons, Dominick and Alex (actual names are Nicholas—usually called Nick—and Alexander), and two grandchildren. And he asserted that respondent used to have a "dilapidated" Packard and now has a 1956 Mercury. Mrs. Introcaso referred to their cars as a 1949 Packard and a 1956 Lincoln.

About one month after Talty's deposition was taken, Introcaso again appeared before the committee. This time he admitted acquaintance with Talty, having met him in 1924 or 1925 when he was clerking in Jersey City. However, he saw no more of him until about two and one-half years ago when he accidentally ran into him at the Hudson County Court House. At that time, Talty said he was a bondsman and asked that bail bond work be referred to him. Respondent denied any dealings with Talty thereafter and insisted that subsequently he had seen him only once or twice around the court house. And he reiterated his earlier testimony that Miskiewicz and his other clients had come to him unsolicited by Talty or any one else.

It will be recalled that in the original proceedings on June 15, 1956, Introcaso had been asked, "Without regard to the name, do you know any person of such description?" and had replied, "No, I swear on my solemn oath." During the final hearing on November 15, 1957, after conceding that he knew Talty, he was asked, "Today, regardless of what name such a man may have gone under, today you do say to the Committee that you did know a man of such a description, forgetting what name he may have used?" The answer was, "Of that description, yes. * * * By the name of Talty, though."

At the conclusion of the hearings, the committee repeated its original finding of violation of *Canons* 22, 27 and 28. In addition, by reason of Talty's testimony, the further finding was made of infraction of *Canon* 34 which, as has been set forth above, condemns fee splitting.

Our own study and analysis of the entire record have left us without doubt as to respondent's guilt of the offenses charged in the presentment of the committee. Much criticism has been leveled against Talty's testimony. It is true that his record is black and that his conduct calls for critical evaluation of his statements. Indeed, his character undoubtedly was in some measure responsible for respondent's refusal to acknowledge acquaintance with him or any of the office visits asserted by him. As was said in the 1929 *Report of the Special Committee on Professional Abuses in Accident Litigation,* of which Mr. Henry S. Drinker, Jr., author of *Legal Ethics* (1953) was chairman:

"The paid solicitors—known as runners—employed by the attorneys engaged in this practice, are usually unscrupulous men of a low type and are known to be such by the lawyers who employ them, although such lawyers always cultivate a deliberate ignorance of their activities." *In re Frankel,* 20 *N. J.* 588, dissent, at *page* 609 (1956).

There are some minor inconsistencies in Talty's assertions. But when the substance of his testimony is considered in relationship with that of Miskiewicz, Mrs. Nealon and Zeuner, and in concatenation with all of the circumstances of the case, its probative force is irresistible to the reasonable mind. Introcaso's statements, replete as they are with equivocation, evasion and disingenuous denials, suffer by comparison. As a consequence, we conclude that the evidence in its totality overwhelmingly sustains the ultimate finding of the committee that *Canons* 27 and 28 were violated, that respondent divided his legal fees with Talty contrary to *Canon* 34, and that on this disciplinary proceeding, his conduct was incompatible with the candor and fairness demanded by *Canon* 22.

Thus we are brought to the matter of discipline. In this connection, at the outset it cannot escape notice that *Canon* 28, of itself, furnishes a public indication of the gravity of the offense of employing touters or runners. That canon, after describing the practice as "disreputable," concludes by asserting that "A duty to the public and to the profession devolves upon every member of the Bar having knowledge of such practices upon the part of any practitioner immediately to inform thereof, to the end that the offender may be disbarred."

In 1956, this court had to deal for the first time with the practice of solicitation of accident cases by means of runners. *In re Frankel, supra.* The offense was characterized as "a serious transgression of the ethical principle that is the sworn obligation of every practitioner of the law, the more reprehensible and vicious because the solicitation is had through agents and runners." *Ibid.,* 20 *N. J.* at *page* 598. Its gross unfairness to honorable and competent members of the bar as a competitive factor was also noted. And our view of the serious nature of such unethical conduct was clearly made known.

Discipline is generally regarded as non-punitive in its essence. The primary purpose is to protect the public against members of the bar who are unworthy of the trust and confidence essential to the relationship of attorney and client. *Ibid.,* 20 *N. J.* at *page* 596. And comparing degrees of evil arising from the use of runners (if such odious comparisons can be considered possible), the public probably requires more protection from the solicitor of criminal than of civil cases. For in criminal causes, the accused's life or liberty is at stake, and when he yields to the exaggerated and usually wholly unwarranted claims as to the professional competence of the attorney represented by the touter, his jeopardy is doubled. This must be prevented.

Imposition of the drastic discipline of disbarment rests in the sound discretion of the court. However, this discretion is exercised in the light of all of the circumstances of the offense, the previous record of the offender, and our

duty to protect the public. The immediate impulse here is to strike respondent's name from the roll of members of the bar. But we have concluded to refrain from doing so and to visit upon him a severe but less final measure of discipline, for reasons to be stated.

Introcaso was admitted to the bar in 1934. He has resided in Jersey City with his family and practiced there during that period. His record is free from any other charge of unethical conduct. Although *Canons* 27 and 28 are plain in their import, it does appear that his offenses were committed prior to the decision in *In re Frankel, supra.* The charges against Introcaso were filed on January 10, 1956. The opinion in that case came down on February 13, 1956, and the court, in deciding upon the penalty, gave consideration to the fact that the proceeding was the first of its kind under the *Canons.* The time element has been accorded a fair measure of influence here also.

The respondent is suspended from the practice of law for a period of three years, and until the further order of this court.

*For suspension for three years*—Chief Justice WEINTRAUB, and Justices HEHER, WACHENFELD, BURLING, JACOBS, FRANCIS and PROCTOR—7.

*Opposed*—None.