721 A.2d 992

IN THE MATTER OF PATRICK M. PAJEROWSKI,
AN ATTORNEY AT LAW.

Argued October 14, 1998—Decided December 4, 1998.

*Robert J. De Groot,* argued the cause on behalf of the Office of Attorney Ethics.

*Lewis P. Sengstacke,* argued the cause for respondent (*Davis, Saperstein & Salomon,* attorneys).

PER CURIAM.

This matter arises from a recommendation for discipline filed by the Committee on Attorney Advertising ("CAA") against respondent, Patrick M. Pajerowski. Respondent and the CAA executed a Stipulation of Facts and Discipline in which respondent admitted that he had violated the following *Rules of Professional Conduct:* *RPC* 1.2(a) (failing to abide by client's decision); *RPC* 1.3 (failing to act with diligence); *RPC* 1.4(a) (failing to communicate); *RPC* 1.7(a), *RPC* 1.7(b), and *RPC* 1.7(c) (representing clients with conflicts of interest); *RPC* 1.8(e) (providing financial assistance to client); *RPC* 1.8(j) (acquiring proprietary interest in client's cause of action); *RPC* 1.9(a) (representing client with interest adverse to former client); *RPC* 5.3 (failing to properly supervise nonlawyer); *RPC* 5.4 (splitting fees with nonlawyer); *RPC* 5.5 (assisting in unauthorized practice of law); *RPC* 7.1(a) (providing misleading communication about lawyer's services); *RPC* 7.2(c) (giving value for recommending legal services); *RPC* 7.3(b) (soliciting client unable to exercise reasonable judgment); *RPC* 7.3(d) (providing compensation for recommending lawyer's services); *RPC* 8.4(a) (violating *Rules of Professional Conduct* ); and *RPC* 8.4(d) (engaging in conduct prejudicial to the administration of justice).

In seventy-three paragraphs, the Stipulation detailed respondent's misconduct. It proposed a three-year suspension. A majority of the Disciplinary Review Board (DRB) voted to disbar respondent. Three members voted to impose a three-year suspension. Based on our independent review of the record, we are persuaded that the evidence clearly and convincingly establishes that respondent should be disbarred.

I.

Respondent, who was admitted to the bar in 1978, maintains a law office in Newark, New Jersey. His misconduct can be grouped into four categories: the Runner cases, the Loan cases, the Failure to Communicate case, and the Conflict of Interest case.

## A.

The Runner cases present respondent's most serious ethical transgressions. From February 16, 1991 through December 29, 1994, respondent employed Kenneth Burgess as a runner to solicit business for him.

The DRB decision summarized the stipulated facts with regard to the runner cases as follows:

*The Bartee Matter*

On December 28, 1994, a vehicle driven by Kimberlee Bartee was involved in an accident. Her brother, John Bartee, Jr., and a friend, Chanel Churchwell, were passengers in the car. The next day, Burgess and an unidentified man visited the Bartee home and left a solicitation letter for Kimberlee Bartee. Upon receiving a call from her, Burgess returned to the Bartee residence with retainer agreements. He directed Kimberlee to complete a form, in which she complained of back and head pain. Burgess told Kimberlee that she should visit a particular doctor for treatment. The doctor was an internist selected by respondent's office. Burgess also told Kimberlee that she should obtain treatment two or three times per week to bolster the claim. When John Bartee indicated that he also had been involved in the accident, Burgess directed him to complete a form as well, in which John complained of back and head pain. Although not injured in the accident, Kimberlee and John Bartee obtained treatment from the doctor recommended by Burgess. According to a statement given by Kimberlee to Home Insurance Company, which was investigating possible insurance fraud, all of the patients in the doctor's waiting room had indicated that they had been referred by respondent. Kimberlee told Home Insurance Company that neither she nor her brother had suffered any pain until after they were treated by the doctor. The pain disappeared only after they discontinued the treatment.

At 6:00 P.M. on the day of the accident, December 28, 1994, Burgess and an unidentified individual also went to Chanel Churchwell's home to solicit her representation. Burgess obtained Chanel's consent to retain respondent as her attorney.

Although respondent was engaged to simultaneously represent the driver of the vehicle and its passengers, he failed to disclose to his clients the circumstances of the multiple representation and to obtain their consent thereto. According to Kimberlee, she never met respondent or went to his office.

On February 2, 1995, respondent notified Kimberlee that he would not be representing her, ostensibly because the police report and other investigation demonstrated that she had caused the automobile accident. Respondent continued to represent the passengers, who filed claims against Kimberlee, without disclosing to all of them the circumstances of the representation or obtaining their consent to continue as their attorney.

*The Lewis Matter*

Tracey Lewis was treated at a hospital for injuries sustained in an automobile accident on October 3, 1993. The next day Burgess appeared at Lewis's residence, gave her respondent's business card and solicited respondent's professional employment. At the time of the solicitation, respondent did not know if Lewis's physical, emotional or mental state was such that she could exercise reasonable judgment in employing a lawyer. In fact, according to the investigative report, Lewis was very upset that Burgess went to her home. She had been traumatized by the car accident and had not yet obtained a copy of the police report. Despite making it clear to Burgess that she was not interested in retaining respondent, two weeks later she received in the mail a t-shirt with the logo of respondent's law firm on it.

*The Santos Matter*

On February 16, 1991, Eileen Santos was taken to the emergency room of a hospital for treatment, following a car accident. The next day Burgess went to the Santos residence and introduced himself as respondent's "legal assistant." Burgess gave Santos a copy of the police report, a retainer agreement and other documents. Burgess told Santos that he would arrange for examination and treatment by a doctor as soon as she signed the retainer agreement. At the time of Burgess's solicitation, respondent did not know whether Santos's physical, emotional or mental state was such that she could exercise reasonable judgment in employing a lawyer.

*The Graves Matter*

Regetta Graves was injured while riding as a passenger on a New Jersey Transit bus on September 21, 1993. On the same day Burgess and another individual went to the Graves residence. Burgess told Graves that respondent represented other bus passengers. He offered to refer her to doctors and to assist her in obtaining compensation for her injuries. Later that day a solicitation letter from respondent was taped to Graves's mailbox.

*The Quarles Matter*

On September 10, 1991, Andrew and Lucille Quarles suffered injuries as a result of an automobile accident. On the same day Burgess went to the Quarles residence. Although he was not able to see them, Burgess left respondent's business cards, which listed Burgess's name under the law firm's name. This attempt to contact Mr. and Mrs. Quarles occurred prior to the filing of police reports. At the time of the attempted solicitation, respondent did not know whether the Quarleses' physical, emotional or mental state was such that they could exercise reasonable judgment in employing a lawyer.

*The Harris Matter*

George Harris, Jr. sustained injuries in an automobile accident on December 5, 1991. Later that day, Burgess left respondent's business card at Harris's residence. The business card listed Burgess's name under the law firm's name. Burgess's attempted solicitation took place before the filing of police reports, at a time when respondent did not know whether Harris's physical, emotional or mental state was such that he could exercise reasonable judgment in employing a lawyer.

*The Green Matter*

On July 20, 1993, Janet Green was taken to a hospital after being injured in an automobile accident. Burgess approached her in the emergency room, gave her one of respondent's business cards and told her that respondent would obtain a larger monetary award for her than any other attorney. At the time of this solicitation, respondent did not know whether Green's physical, emotional or mental state was such that she could exercise reasonable judgment in employing a lawyer.

*The Gonzalez Matter*

Adelaida Gonzalez was injured in an automobile accident on July 20, 1993. Burgess visited her at the hospital emergency room, handed her respondent's busines card with Burgess's name on it and solicited her to retain respondent as her attorney. Later Burgess contacted Gonzalez by letter and telephone to persuade her to retain respondent. At the time Burgess approached Gonzalez, respondent had no knowledge of whether her physical, emotional or mental state was such that she could exercise reasonable judgment in employing a lawyer.

## B.

### *Loan Cases*

Respondent stipulated that in ten separate matters, he had provided financial assistance to individual clients in connection with their pending or contemplated litigation by advancing sums of money up to the amount he thought would be the net settlement of their particular claim. Respondent failed to explain to those clients the potential conflicts that could arise from advancing money and did not suggest that those clients execute any written agreement for the loan transactions. Respondent stipulated that he was unaware that such financial assistance to clients was prohibited.

## C.

### *Failure to Communicate in the Evans Case*

The DRB decision summarizes the Evans case as follows:

According to the stipulation, on March 4, 1991 respondent undertook to represent Dora Evans after she was involved in an automobile accident. Respondent received and accepted a settlement offer from one insurer and rejected a settlement offer from another. After respondent submitted to the first insurer a release executed by Evans, the insurer withdrew the offer. On July 22, 1993 respondent

filed a complaint naming as defendants the drivers of both automobiles involved in the accident and the first insurer. On February 6, 1995, respondent obtained a default and then consented to vacate the default and to permit the insurer to file an answer. After respondent's motion to enforce the settlement was granted, he sent the net settlement proceeds to Evans on February 21, 1996. Respondent subsequently settled the litigation with the second insurer for $1,500. Throughout the five years during which the matter was pending, respondent failed to communicate with Evans. He did not return her telephone calls or send her any correspondence about the case.

## D.

### *Conflict of Interest Case*

As previously set forth in the *Bartee* matter, *supra* at 511, 721 A.2d at 993, respondent, without disclosing multiple representation or obtaining an informal consent from the parties, represented both the passengers, John Bartee, Jr. and Chanel Churchwell, and Kimberlee Bartee, the driver. When respondent terminated his representation of Kimberlee, he continued to represent the passengers without securing their consent.

## E.

### *Mitigating Facts*

Respondent has cooperated with the disciplinary authorities and has accepted the impropriety of his conduct. He has no prior disciplinary record. He also claims as a mitigating factor that his alcoholism impaired his ability to make ethical judgments. He has been in treatment for that disease and claims he has not consumed any alcoholic beverages since May 1997.

## II.

The DRB found that respondent had violated the *Rules of Professional Conduct.* Based on our independent review of the record, we are persuaded that the evidence clearly and convincingly establishes that respondent has committed the eighteen violations of the *Rules of Professional Conduct* with which he has been charged.

## A.

Respondent solicited clients through his runner, Kenneth Burgess, who contacted accident victims either at their homes or in hospitals on the same day that the accidents occurred or shortly thereafter. Burgess would speak to the victims or their relatives and attempt to persuade them to retain respondent to represent them in connection with their claims. He would bring retainer agreements with him. If he was unable to see the victim or their relatives, he would leave respondent's card, and then follow up in some instances by posting letters in the prospective clients' mailboxes. In many cases, respondent was not aware of the extent of the victims' injuries. He did not know the physical, emotional or mental state of many of his prospective clients. Consequently, he did not know whether they could exercise reasonable judgment in retaining his services.

In his brief, respondent claims that he did not preauthorize the gross improprieties committed by Burgess, such as soliciting clients in emergency rooms on the days of their accidents, or at their homes shortly after their accidents. Nonetheless, the Stipulation recites that although respondent was unaware of each solicitation at the time it occurred, he had previously authorized such conduct and subsequently ratified it by accepting the clients and paying Burgess. As a result, respondent encouraged Burgess to engage in similar future misconduct. Accordingly, respondent in the Runner cases violated *Rule* 5.3, *Rule* 7.1(a), *Rule* 7.3(b), *Rule* 8.4(a) and *Rule* 8.4(d).

Moreover, respondent paid Burgess wages far in excess of the reasonable value of his services as an office manager and investigator. Burgess' salary was $1200 per week in 1992, for an annual salary of $62,400, but was increased to $3500 per week in 1994, or $182,000 per year. During the Board hearing, it was observed that Burgess' earnings exceeded those of the average attorney in New Jersey. Respondent stipulated that by giving Burgess such a substantial salary he was "compensating him or giving him something of value to recommend or secure respondent's employ-

ment by clients, or as an award for having made recommendations resulting in respondent's employment by clients." Respondent engaged in unethical fee-splitting with Burgess, a nonlawyer, assisted him in the unauthorized practice of law and compensated him monetarily for recommending his services to prospective clients. By so doing, respondent violated *Rule* 5.4, *Rule* 5.5, *Rule* 7.2(c) and *Rule* 7.3(d).

In the *Bartee* matter, respondent engaged in a conflict of interest situation. As previously observed, respondent represented Kimberlee Bartee, the driver of an automobile involved in an accident, at the same time that he represented the two passengers who had been in Bartee's vehicle. By representing both the driver and passengers without disclosing the potential conflict of interest or obtaining his clients' consent to the multiple representation, respondent violated *Rule* 1.7(a) and *Rule* 1.7(b). In addition, by continuing to represent the passengers after terminating the representation of Bartee, respondent violated *Rule* 1.9(a).

Respondent also acted unethically in the *Evans* matter. He filed a complaint against an insurance company to enforce a settlement. In the five years during which that complaint was pending, respondent did not communicate with Evans, return her telephone calls or send her copies of any correspondence. Also, he did not consult with her about the settlement of her case and took almost two years to obtain a default against the insurance company that had withdrawn a settlement offer. Respondent's conduct in the *Evans* matter violated *Rule* 1.2(a), *Rule* 1.3 and *Rule* 1.4(a).

Respondent also admitted that he advanced sums of money to clients in ten instances and that he did not explain to them the inherent conflict of interest resulting from such loans. Respondent neither prepared loan documents nor suggested that his clients sign any documentation regarding the transactions. In advancing sums to clients, respondent violated *Rule* 1.7(b), *Rule* 1.8(e), and *Rule* 1.8(j). Although the Stipulation did not specifically correlate *Rule* 1.7(c) to any particular act of misconduct,

respondent's simultaneous representation of the driver and passengers of the same vehicle, as well as his advancing of sums to ten clients, constituted violations of that rule.

### III.

The DRB agreed that respondent had violated the eighteen *Rules of Professional Conduct* but disagreed on the appropriate discipline to be imposed with respect to the Runner cases. The majority of the DRB recommended disbarment. It stated:

> In these matters, respondent took gross advantage of accident victims almost immediately after the accidents occurred, disregarding their right to privacy. Through his agent, Burgess, respondent attempted to take advantage of individuals when they were most vulnerable. Sadly, in many cases he succeeded. Burgess's actions in visiting accident victims at their homes, and particularly at hospital emergency rooms, constituted the practice of "ambulance-chasing" that is so unsavory and repugnant to the legal profession. The effect upon an accident victim cannot be understated. Victims must have a right to be insulated from those who would attempt to prey upon their vulnerability. Although it is not the primary purpose of discipline to punish, it is a primary purpose of discipline to protect the public. The public needs protection from this respondent and any others who might pursue the same course.

The DRB further observed:

> Respondent's misconduct was not only unprofessional and intrusive, but also regrettably contributes to the negative image that some members of the public associate with attorneys. Respondent's misconduct not only dishonored himself but also the profession whose reputation this Board is charged to protect. Respondent's ethics violations damaged not only the prospective clients he solicited, but also the entire bar.

Indeed, the majority of the DRB found that "there is no penalty short of disbarment appropriate for this fact pattern." Accordingly, the DRB suggests that it "will not hesitate to recommend disbarment when a pattern of pervasiveness is proven by the requisite standard of proof."

The dissenting members of the DRB view respondent's misconduct differently. They believe that it does not rise to the level of conduct that would justify disbarment. They found that respondent had not engaged in a continuous course of misconduct that demonstrates an attitude wholly inconsistent with and indifferent to ethical standards (thus warranting the label "incorrigible").

Nor did they find that respondent committed an offense of so gross a nature, such as bribery of a public official, theft, or embezzlement, that no other penalty but disbarment would be suitable. They particularly focused on respondent's cooperation with the disciplinary authorities and his acceptance of the impropriety of his conduct in determining that appropriate discipline would be a three-year suspension.

## IV.

### A.

Since *In re Frankel*, 20 *N.J.* 588, 120 *A.*2d 603 (1956), the seminal case on "runners," this Court has held that attorneys using "runners" to solicit clients are guilty of unethical misconduct. In *Frankel*, the respondent used a runner to solicit personal injury clients. He compensated the runner at the rate of twenty-five percent of his net fee. The Court found that Frankel had violated *Canon 28*, soliciting clients, and *Canon 34*, dividing fees with a nonlawyer. In imposing a two-year suspension rather than disbarment, the majority of the Court observed that Frankel was the first attorney to be prosecuted for this violation. *Id.* at 598, 120 *A.*2d 603. The Court also observed that Frankel had a previously unblemished professional reputation. *Ibid.* Nevertheless, the Court expressed its strong disapproval of the practice:

> Frankel's offense is classed by the canon itself as one justifying disbarment. It is accounted a serious transgression of the ethical principle that is the sworn obligation of every practitioner of the law, the more reprehensible and vicious because the solicitation is had through agents and runners. See *Chreste v. Commonwealth*, 171 *Ky.* 77, 186 *S.W.* 919 (1916); *Drinker's Legal Ethics*, p. 28 *et seq.* Quite apart from its own inherent vice and its contaminating influence as a competitive factor, it is a practice that tends to corrupt the course of justice, and so the more abominable and evil in its incidence, although it is but fair to say there is no suggestion of that here.
>
> [*Ibid.*]

Further, the Court observed that "[f]or such infractions in the future more drastic measures may be expected." *Id.* at 599, 120 *A.*2d 603. In a strong dissent Justice Brennan, then of the New

Jersey Supreme Court, joined by Chief Justice Vanderbilt, advocated Frankel's disbarment:

> I do not think we can fail to emphasize the seriousness of the offense committed by the respondent. In the vernacular, it is 'ambulance chasing,' * * * Three decades ago this pernicious practice was rampant in many sections of the country and led to numerous investigations which, for a time at least, cleansed the profession of a number of practitioners guilty of the most flagrant abuses.
>
> [*Id.* at 607, 120 *A*.2d 603.]

The next "runner" case was *In re Introcaso*, 26 *N.J.* 353, 359, 140 *A*.2d 70 (1958). There, the Court found that the respondent had violated *Canons* 22, 27, 28 and 34, by employing a runner to solicit clients in three criminal matters, by improperly dividing legal fees, and by testifying with a lack of candor. However, because Introcaso's conduct had occurred before the Court's decision in *In re Frankel, supra,* and due to his unblemished reputation, the Court imposed only a three-year suspension.

In 1972, the Court held that a three-month suspension from the practice of law was appropriate discipline for a respondent who accepted referrals and who had remitted part of his fees to his runner. *In re Bregg*, 61 *N.J.* 476, 295 *A*.2d 360 (1972). In that case the Court observed that the case was different from the "kind of studied and hardened disregard for ethical standards, accompanied by a total lack of candor, that was present in both *In re Frankel, supra,* 20 *N.J.* at 588, 120 *A*.2d 603, and *In re Introcaso, supra,* 26 *N.J.* at 353, 140 *A*.2d 70." *Id.* at 478–79, 295 *A*.2d 360.

In *In re Shaw,* 88 *N.J.* 433, 443 *A*.2d 670 (1982), however, the Court disbarred an attorney who represented both passenger and driver involved in an accident suit, used a runner to solicit a client in a personal injury case, "purchased" the client's cause of action for $30,000, settled the case for $97,500 and then had his runner forge the client's name on the check. In that case the DRB recommended a suspension of three years. Observing that ["i]t is difficult to imagine a more sinister threat to a professional relationship than the conduct so painstakingly portrayed in the DRB's report," the Court held that respondent must be disbarred. *Id.* at 442, 443 *A*.2d 670.

As recently as 1998, we voiced our strong disapproval of the employment of a runner to solicit legal business. *In re Ravich, Koster, Tobin,* 155 *N.J.* 357, 374, 715 *A.*2d 216 (1998). In observing that one of the attorney's actions bordered on the "unethical practice of running," we stated:

> In *In re Frankel,* 20 *N.J.* 588, 120 *A.*2d 603 (1956), we disciplined an attorney for entering into a monetary agreement with a photographer who would visit accident scenes and solicit negligence cases for the attorney. We characterized the conduct as "reprehensible and vicious" and a "serious transgression of the ethical principle[s]." *Id.* at 598, 120 *A.*2d 603. Misconduct based on "running" remains a public and professional concern. *See, e.g.,* Assembly Bill No. 1829 (reflecting view that the hiring of a runner to solicit professional services on behalf of an attorney should be subject to criminal sanctions).

We recognize that when *In re Frankel, supra,* 20 *N.J.* 588, 120 *A.*2d 603 and *In re Introcaso, supra,* 26 *N.J.* 353, 140 *A.*2d 70, were decided attorneys were forbidden from soliciting business, either directly or through employees or runners. *See Canon* 28 (then in effect); *Canon* 27 (forbidding "touters."). Today lawyers are allowed to advertise and solicit business subject to reasonable regulations. *Ohralik v. Ohio State Bar Ass'n,* 436 *U.S.* 447, 462, 98 *S.Ct.* 1912, 1921, 56 *L. Ed.*2d 444, 457 (1978). Nonetheless, when an attorney pays a runner to solicit clients, numerous problems arise that adversely affect the public, the bar and the judicial system. Soliciting accident victims so soon after their injuries presents an opportunity for "fraud, undue influence, intimidation, overreaching, and other forms of vexatious conduct." *Ibid.* As is evident in this case, Burgess was fabricating false medical claims and respondent authorized such communications. For example, with respect to the *Bartee* matter, respondent stipulated the following:

> 7. Kenneth Burgess advised Kimberly Bartee that Respondent's office would send her to a doctor and that she would receive treatments for her back two or three times a week. He then directed her to fill out a form indicating that she was suffering from back and head pain.
>
> 8. When John Bartee, Jr. entered the room and advised him that he too had been in the car, Mr. Burgess directed him to fill out a form indicating that he was suffering from back and head pain.
>
> 9. Respondent authorized Kenneth Burgess to communicate this information to prospective personal injury clients such as Kimberly Bartee and have them execute

retainer agreements and, in some instances, forms indicating that they were suffering from back and head pain.

Indeed, the dangers Justice Brennan discussed in his dissent in *In re Frankel, supra,* 20 *N.J.* at 610, 120 *A.*2d 603 are amply demonstrated in this case. Quoting from the 1929 *Report of the Special Committee on Professional Abuses in Accident Litigation,* chaired by Henry S. Drinker, Jr., Justice Brennan stated:

> Such organized solicitation of accident claims, conducted by such type men, inevitably results in the manufacture of fake claims, in the gross exaggeration of scratches and bruises to the appearance of major injuries, and in the fraudulent attempt to attribute real injuries or ailments to accidents which really had no causal relation to them—all by means of perjured testimony, usually in collusion with one or more of a class of physicians who make a practice, for a contingent compensation, of giving such expert testimony as will meet the necessities of the case.
>
> 'The practice of 'ambulance chasing' is so well known and so obviously improper as to require no extensive comment. It is most prevalent in large communities, and comprehensive investigations and drives to stamp it out have been held, with more or less success, usually but temporary, in many such jurisdictions.'

[*Ibid.*]

## B.

The primary purpose of discipline is to protect the public, and not to punish the attorney. *In re Rutledge,* 101 *N.J.* 493, 498, 502 *A.*2d 569 (1986). In *In re Anis,* 126 *N.J.* 448, 457, 599 *A.*2d 1265, *cert. denied subnom. Anis v. New Jersey Committee on Attorney Advertising,* 504 *U.S.* 956, 112 *S.Ct.* 2303, 119 *L. Ed.*2d 225 (1992), a case involving direct-mail solicitations and not in-person solicitation, we "emphasized that one of the central goals of attorney discipline is to maintain public confidence in the bar and in the professionalism of its members." It is important that we preserve the confidence of the public in the integrity of the legal system.

Although the public needs to be protected from the solicitation of legal business by runners, we do not find that disbarment is called for in every "runner" case. In determining the appropriate discipline to be imposed in prior "runner" cases, *supra,* at 518–521, 721 A.2d at 997–999, we have considered the circumstances

surrounding each case. We intend to adhere to that approach in such cases.

## V.

In examining respondent's conduct, we recognize that he has cooperated with the disciplinary authorities and has acknowledged the impropriety of his conduct. Respondent's misconduct with regard to the Loan cases, his failure to communicate in the *Evans* case, and his representation of both driver and passengers in *Bartee* would not require respondent's disbarment. However, respondent knew and condoned Burgess' conduct in assisting his clients to file false medical claims. Such misconduct "poisons the well of justice," and constitutes "grave misconduct that goes to the heart of the administration of justice." *In re Verdiramo*, 96 *N.J.* 183, 185, 475 *A.2d* 45 (1984); *see also In re Edson*, 108 *N.J.* 464, 530 *A.2d* 1246 (1987) (disbarring attorney who counseled his client to fabricate evidence to meet elements of defense to legal action); *In re Conway*, 107 *N.J.* 168, 180, 526 *A.2d* 658 (1987) (corrupting judicial process by suborning perjury or tampering with witnesses merits disbarment). Indeed, one of the most serious problems associated with "runner" cases is that runners in order to increase their own compensation induce clients to exaggerate their claims and, in many instances, to file fraudulent claims.

Burgess' continued contact with the prospective clients, together with the very substantial annual salary of $182,000 paid to him, shows how pervasive and extensive were his solicitations for respondent. Respondent acted out of economic greed and took advantage of persons who were vulnerable. Respondent's actions harmed the public and cast the profession in a negative light. Considering the serious and numerous acts of misconduct committed with respect to the Runner cases, together with his other ethical transgressions, we find that no discipline short of disbarment is justified.

Respondent is disbarred. He is to reimburse the Disciplinary Committee for appropriate administrative costs.

*For disbarment*—Chief Justice PORITZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN, and COLEMAN—7.

*Opposed*—None.

### ORDER

It is ORDERED that **PATRICK M. PAJEROWSKI** of **NEW-ARK**, who was admitted to the bar of this State in 1978, be disbarred and that his name be stricken from the roll of attorneys of this S tate, effective immediately; and it is further

ORDERED that **PATRICK M. PAJEROWSKI** be and hereby is permanently restrained and enjoined from practicing law; and it is further

ORDERED that all funds, if any, currently existing in any New Jersey financial institution maintained by **PATRICK M. PAJER-OWSKI**, pursuant to *Rule* 1:21-6, be restrained from disbursement except upon application to the Court, for good cause shown, and shall be transferred by the financial institution to the Clerk of the Superior Court who is directed to deposit the funds in the Superior Court Trust Fund, pending further Order of this Court; and it is further

ORDERED that **PATRICK M. PAJEROWSKI** comply with *Rule* 1:20-20 dealing with disbarred attorneys; and it is further

ORDERED that **PATRICK M. PAJEROWSKI** reimburse the Disciplinary Oversight Committee for appropriate administrative costs.