David M. PIETSCH, D.C.,
et al., Relators,

v.

MINNESOTA BOARD OF CHI-
ROPRACTIC EXAMIN-
ERS, Respondent.

No. C6–02–2117.

Court of Appeals of Minnesota.

June 17, 2003.

John B. Wolfe, Jr., Wolfe & Associates, St. Paul, and Wilbur W. Fluegel, Fluegel Law Office, Minneapolis, for relators David M. Pietsch, D.C. and Pietsch Chiropractic Clinic.

Mike Hatch, Attorney General, Rosellen Condon, Assistant Attorney General, St. Paul, for respondent.

Considered and decided by HALBROOKS, Presiding Judge, HARTEN, Judge, and FORSBERG, Judge.*

**O P I N I O N**

HALBROOKS, Judge.

Relator David Pietsch challenges the Minnesota Board of Chiropractic Examin-

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

ers' conclusions that he engaged in unlawful fee splitting in violation of Minn.Stat. § 148.10, subd. 1(a)(16) (2002), and unprofessional conduct in violation of Minn.Stat. § 148.10, subd. 1(a)(11), (e) (2002). Relator moves to strike portions of respondent's brief and asserts that the board's conclusions are not supported by substantial evidence. We conclude that the board's determination that relator engaged in unprofessional conduct is supported by substantial evidence, but that the board's holding that relator engaged in unlawful fee splitting is not supported by substantial evidence. We, therefore, affirm in part and reverse in part. Because section IV of respondent's brief addresses an issue that was not raised by relator, we grant relator's motion to strike in part.

## FACTS

Relator David Pietsch is a licensed chiropractic doctor who owns, operates, and provides chiropractic services through Pietsch Chiropractic Clinic, Inc. Relator's chiropractic practice focuses primarily on providing treatment to persons who have been involved in automobile accidents where no-fault insurance claims can be submitted to insurance companies. A large percentage of relator's patients are persons from the Hmong community who have been involved in automobile accidents.

In 1999, relator contracted with Hue Xiong and Cha Xiong of Xiong Translation & Transportation Company to market his chiropractic services to the Hmong community. Xiongs' practice was to obtain publicly available accident reports from local police departments each morning. Using these reports, Hue Xiong and Cha Xiong identified accident victims by ethnic group so that one of relator's agents from the same ethnic group could contact them to determine if they had been injured, advise them of their rights under the no-fault insurance laws, and solicit them to become patients at the Pietsch Chiropractic Clinic. In exchange for the services of Hue Xiong and Cha Xiong, Pietsch Chiropractic Clinic paid Xiong Translation & Transportation Company $71,000 in 1999 and $95,000 in 2000.

On March 1, 2001, relator was summoned to appear before the Complaint Panel of the Minnesota Board of Chiropractic Examiners in order to respond to allegations of fee splitting based on complaints that relator was paying two men to solicit business for him. After hearing testimony from relator, the panel concluded that there was insufficient evidence to pursue the matter further at that time.

Following the March 2001 meeting, the board received additional evidence that relator was engaging in fee splitting. As a result, on March 22, 2002, the board, through its complaint panel, served relator with a notice of and order for prehearing conference and hearing. The notice alleged that relator had engaged in fee splitting in violation of Minn.Stat. § 148.10, subd. 1(a)(16) (2002), by using "runners" or "cappers" to solicit people involved in automobile accidents and had engaged in unprofessional conduct in violation of Minn. Stat. § 148.10, subd. 1(a)(11), (e), by instructing chiropractic interns how to defraud insurance carriers by falsifying treatment bills and examination reports.

The complaint panel moved for summary disposition on the issue of fee splitting and relator's use of "runners" to solicit patients. Following a hearing, the administrative law judge (ALJ) recommended that the Minnesota Board of Chiropractic Examiners grant the complaint

panel's motion for summary disposition as to the fee splitting issue. The ALJ found that there were issues of fact as to whether relator's conduct constituted unprofessional conduct per se, and recommended further proceedings regarding this issue.[1]

After considering the ALJ's recommendations, the board concluded that relator's use of "runners" constituted both fee splitting, in violation of Minn.Stat. § 148.10, subd. 1(a)(16), and unprofessional conduct, in violation of Minn.Stat. § 148.10, subd. 1(a)(11), (e). The board suspended relator's chiropractic license for three years, assessed a civil penalty of $30,000, and imposed other sanctions. This certiorari appeal follows.

### ISSUES

1. Is the board's conclusion that relator engaged in fee splitting in violation of Minn.Stat. § 148.10, subd. 1(a)(16) (2002), supported by substantial evidence?

2. Is the board's conclusion that relator engaged in unprofessional conduct in violation of Minn.Stat. § 148.10, subd. 1(a)(11), (e) (2002), supported by substantial evidence?

3. Is relator entitled to relief on his motion to strike portions of respondent's brief?

### ANALYSIS

 Relator contends that the Minnesota Board of Chiropractic Examiners'

conclusions that he engaged in unlawful fee splitting and unprofessional conduct under Minn.Stat. § 148.10, subds. 1(a)(16) and 1(a)(11), (e) (2002), are not supported by substantial evidence.

In a judicial review [of a contested case hearing], the court may affirm the decision of the agency or remand the case for further proceedings; or it may reverse or modify the decision if the substantial rights of the petitioners may have been prejudiced because the administrative finding, inferences, conclusion, or decisions are:

(a) in violation of constitutional provisions; or

(b) in excess of the statutory authority or jurisdiction of the agency; or

(c) made upon unlawful procedure; or

(d) affected by other error of law; or

(e) unsupported by substantial evidence in view of the entire record as submitted; or

(f) arbitrary and capricious.

Minn.Stat. § 14.69 (2002). When an agency acts in a quasi-judicial capacity, an appellate court applies the substantial-evidence test on review. *In re Petition of N. States Power*, 416 N.W.2d 719, 723 (Minn. 1987). Substantial evidence is defined as:

1. Such relevant evidence as a reasonable mind might accept as adequate to support a conclusion;

2. More than a scintilla of evidence;

3. More than some evidence;

4. More than any evidence; and

---

1. We note that both parties, in their briefs, and the board, in its decision, state that the ALJ concluded that relator's conduct was not unprofessional conduct per se. But the record shows that the ALJ found that there were issues of fact as to whether relator's conduct constituted unprofessional conduct per se, and that the ALJ recommended that a hearing be held on this issue. The ALJ did not conclude that relator's conduct was not unprofessional conduct per se.

5. Evidence considered in its entirety.

*Cable Communications Bd. v. Nor–West Cable Communications P'ship*, 356 N.W.2d 658, 668 (Minn.1984) (quotation omitted).

## I.

█ Relator first argues that the board's conclusion that he engaged in fee splitting in violation of Minn.Stat. § 148.10, subd. 1(a)(16) (2002), is not supported by substantial evidence. The statute provides that

> (a) The state board of chiropractic examiners may refuse to grant, or may revoke, suspend, condition, limit, restrict or qualify a license to practice chiropractic, or may cause the name of a person licensed to be removed from the records in the office of the court administrator of the district court for:
>
> \* \* \* \*
>
> (16) Splitting fees, or promising to pay a portion of a fee or a commission, or accepting a rebate.

Minn.Stat. § 148.10, subd. 1(a)(16).

There is no Minnesota caselaw applying or interpreting Minn.Stat. § 148.10, subd. 1(a)(16). Looking to the common and approved usage of the words and phrases of the statute, "splitting fees" generally means "dividing a professional fee with another person, professional or nonprofessional, for the referral of patients." *See Practice Mgmt. Assocs., Inc. v. Gulley*, 618 So.2d 259, 260 (Fla.Dist.Ct.App.1993) (interpreting and applying Minnesota law); *see also* Minn.Stat. § 645.08 (2002) (stating

that statutory words and phrases should be construed according to rules of grammar and according to the common and approved usage, unless to do so would be inconsistent with the intent of the legislature).

There is no evidence in the record that relator divided fees with Hue Xiong and Cha Xiong on a per-patient referral basis. Instead, the Xiongs were relator's salaried employees. The obvious question arises as to whether this is a distinction without a difference. The board concluded that to find that relator's conduct did not constitute fee splitting would permit chiropractors to disguise prohibited fee-splitting arrangements. While that argument is somewhat attractive and while we in no way condone relator's conduct, based on this record and the statutory language, we conclude that the board's holding that relator engaged in unlawful fee splitting is not supported by substantial evidence.

Minn.Stat. § 148.10, subd. 1(a)(16), does not prohibit chiropractors from paying individuals to solicit accident victims or using runners. It only prohibits fee splitting. If the board or legislature believes that conduct such as relator engaged in is improper, it should pass a rule or law prohibiting such conduct.[2] The board erred in interpreting the fee-splitting statute to prohibit conduct that the plain language of the statute does not prohibit.

Respondent asserts that the board's decision is supported by the Minnesota Supreme Court's decision in *Reyburn v. Minn. State Bd. of Optometry*, 247 Minn. 520, 78 N.W.2d 351 (1956). In *Reyburn*, licensed optometrists had an agreement

---

**2.** In 2002, the Minnesota Legislature passed Minn.Stat. § 609.612 (2002), which prohibits the use of runners by healthcare providers when the provider's purpose is to fraudulently perform or obtain services or benefits under or relating to a contract of motor vehicle insurance.

with an optical company under which the optical company made referrals to the optometrists, and in exchange the optical company received a portion of the income attributable to the referrals. *Id.* at 521–22, 78 N.W.2d at 353. The supreme court held that the

> apportionment of income attributable to the referrals is in itself "unprofessional conduct" as defined by Minn.Stat. § 148.57, subd. 3, as including "splitting or dividing a fee with any person."

*Id.* at 528, 78 N.W.2d at 357.

Respondent relies on *Reyburn* in support of the proposition that fee splitting includes any payment out of a professional licensee's income for the referral of patients. We disagree. In *Reyburn,* the court found that the optometrists had engaged in fee splitting because they had an agreement with an optical company to apportion to the company income attributable to referrals the company made. *Id.* In this case, there is no evidence that relator agreed to apportion any income to Hue Xiong and Cha Xiong that was directly attributable to referrals they made. The only evidence is that Xiong Transportation was paid $71,000 in 1999 and $95,000 in 2000. Because the facts in *Reyburn* are distinguishable from the facts in this case, respondent's reliance on *Reyburn* is misplaced.

Respondent also argues that the board's finding of fee splitting is supported by the New Jersey Supreme Court's decision in *In re Pajerowski,* 156 N.J. 509, 721 A.2d 992 (1998). In *Pajerowski,* an attorney used a runner to contact automobile accident victims to attempt to persuade them to retain the attorney's services. *Id.* at 995. In addition to his solicitation responsibilities, the runner also performed office-management duties. *Id.* at 996. The runner was paid $62,400 in 1992, and $182,000 in 1994. The New Jersey Supreme Court noted that a salary of $182,000 was far in excess of the reasonable value of the runner's services. *Id.* In addition, the attorney stipulated that by giving the runner

> such a substantial salary he was "compensating him or giving him something of value to recommend or secure [the attorney's] employment by clients, or as an award for having made recommendations resulting in [the attorney's] employment by clients."

*Id.* The supreme court concluded that the attorney's conduct constituted numerous violations of the New Jersey Rules of Professional Conduct, including the rule prohibiting fee splitting with a non-lawyer. *Id.*

The facts in *Pajerowski* are distinguishable from the facts in this case. Here, we have no finding by the board that the payment received by Hue Xiong and Cha Xiong was in excess of the value of their services. Further, the Pajerowski court had the attorney's stipulation that the payment to the runner that was in excess of the reasonable value of his services was an award for recommendations that resulted in new business for the attorney. *Id.* Here, the board did not find that the payments made to Hue Xiong and Cha Xiong were an award for increasing the number of relator's patients. Based on this record, we conclude that the board's conclusion that relator engaged in fee splitting in violation of Minn.Stat. § 148.10, subd. 1(a)(16), is not supported by substantial evidence.

## II.

The second issue before us is whether the board's conclusion that relator

engaged in unprofessional conduct in violation of Minn.Stat. § 148.10, subd. 1(a)(11), (e), is supported by substantial evidence. The statute provides that

(a) The state board of chiropractic examiners may refuse to grant, or may revoke, suspend, condition, limit, restrict or qualify a license to practice chiropractic, or may cause the name of a person licensed to be removed from the records in the office of the court administrator of the district court for:

\* \* \* \*

(11) Unprofessional conduct.

Minn.Stat. § 148.10, subd. 1(a)(11). The statute provides further that

unprofessional conduct means any unethical, deceptive or deleterious conduct or practice harmful to the public, any departure from or the failure to conform to the minimal standards of acceptable chiropractic practice, or a willful or careless disregard for the health, welfare or safety of patients, in any of which cases proof of actual injury need not be established.

Minn.Stat. § 148.10, subd. 1(e). The statute lists eight acts that constitute unprofessional conduct and states that the board may by rule define other acts that constitute unprofessional conduct. Minn.Stat. § 148.10, subd. 1(e)(1)–(9).

The board concluded that relator's violation of Minn.Stat. § 148.10, subd. 1(a)(16), constituted unprofessional conduct in violation of Minn.Stat. § 148.10, subd. 1(a)(11), (e). The board determined that relator engaged in unprofessional conduct by paying runners to solicit accident victims, regardless of whether relator's conduct constituted unlawful fee splitting. Relator asserts that his conduct in em-

ploying runners cannot be found to be "unprofessional" because it is not specifically prohibited or defined as unprofessional conduct in the statute.

In defining unprofessional conduct in Minn.Stat. § 148.10, subd. 1(e)(1)–(8), the legislature did not include any reference to the use of runners or the payment of runners to solicit accident victims as acts that constitute unprofessional conduct. In reaching its conclusion that the use of runners to solicit accident victims constituted unprofessional conduct under Minn. Stat. § 148.10, subd. 1(e), because such conduct negatively affects the profession and is unethical, deceptive, and harmful to the public, the board relied on the Minnesota Supreme Court's decision in *Reyburn*, 247 Minn. 520, 78 N.W.2d 351.

In *Reyburn*, the supreme court stated that " 'unprofessional conduct' is of itself, without amplification, a sufficiently definite ground upon which [a] board may revoke or suspend a license." *Id.* at 525, 78 N.W.2d at 356. The court stated further that

[i]t is in fact recognized that when, as here (§ 148.53), the legislature empowers the administrative board to adopt such rules and regulations as it may deem necessary or expedient, and does not require the board to do so, the antecedent adoption by the board of rules and regulations defining what constitutes "unprofessional conduct" is not a prerequisite to the suspension or revocation of a practitioner's license for "unprofessional conduct."

*Id.* at 527, 78 N.W.2d at 356–57. Based on the supreme court's decision in *Reyburn*, we conclude that the Board of Chiropractic Examiners has the discretion to make a case-by-case judgment as to whether a

licensed chiropractor's conduct constitutes unprofessional conduct under Minn.Stat. § 148.10, subd. 1(a)(11), (e).

The accident victims relator solicited were predominantly from the Hmong community and were contacted almost immediately after their accidents. Relator's agents, who speak the accident victims' native language, personally solicited them to receive chiropractic treatment at relator's clinic. The accident victims were often injured, vulnerable, and likely not in a position to make informed decisions concerning health care providers or their need for treatment. On this record, we conclude that the board's conclusion that appellant's actions constituted unprofessional conduct because they were unethical, deceptive, and harmful to the public and to the chiropractic profession is supported by substantial evidence.

## III.

In relator's reply brief, he requests that the portions of respondent's brief that accuse relator of lying, knowingly withholding information from the board, misleading the board by denying that he had solicited patients, or having exhibited a lack of candor be stricken from respondent's brief and not considered on appeal. The appellate court record consists of "[t]he papers filed with the trial court, the exhibits, and the transcript of the proceedings, if any." Minn. R. Civ.App. P. 110.01. This court "will strike documents included in a party's brief that are not part of the appellate record." *Fabio v. Bellomo*, 489 N.W.2d 241, 246 (Minn.App.1992) (citation omitted), *aff'd*, 504 N.W.2d 758 (Minn. 1993). The statements in respondent's brief that relator is seeking to strike largely stem from relator's interaction with the board complaint panel in March 2001 and a

letter relator sent to the complaint panel on August 16, 2001. Because the August 16, 2001 letter is in the record, and a review of the letter indicates that it is arguable whether relator was fully forthcoming regarding his solicitation activities, we deny relator's motion to strike these statements.

Relator also requests that section IV of respondent's brief addressing the board's discretion to select a sanction be stricken. Because relator did not challenge the sanction imposed by the board, we grant relator's motion to strike section IV of respondent's brief.

## DECISION

The Minnesota Board of Chiropractic Examiners' holding that relator engaged in fee splitting under Minn.Stat. § 148.10, subd. 1(a)(16) (2002), is not supported by substantial evidence. But the board's holding that relator engaged in unprofessional conduct under Minn.Stat. § 148.10, subd. 1(a)(11), (e) (2002), is supported by substantial evidence and we affirm on that basis. Relator's motion to strike portions of respondent's brief is granted in part.

**Affirmed in part, reversed in part; motion granted in part.**

FORSBERG, Judge, files a dissenting opinion.

FORSBERG, Judge (dissenting).

I respectfully dissent. I concur with the majority that under *Reyburn v. Minn. State Bd. of Optometry*, 247 Minn. 520, 78 N.W.2d 351 (1956), the Board of Chiropractic Examiners has the discretion to make a judgment as to whether relator's conduct constituted unprofessional conduct per se under Minn.Stat. § 148.10, subd.

1(a)(11), (e) (2002).[3] But I believe the board's discretion is not without limitation. Unlike the majority, I believe that Minn. Stat. § 148.10, subd. 1(a)(11), (e), is unconstitutionally vague as applied to relator in this case because the statute failed to provide him with sufficient notice that he was engaging in prohibited conduct. I would, therefore, like the majority, reverse the board's holding that relator engaged in fee splitting, but also reverse the board's holding that relator engaged in unprofessional conduct.

A statute is unconstitutionally vague and violates the Due Process Clause if its prohibitions are not clearly defined. *State v. Century Camera, Inc.,* 309 N.W.2d 735, 744 (Minn.1981) (stating that statute is unconstitutionally vague if it does not give a person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he or she can act accordingly). Many courts have found that statutes prohibiting unprofessional conduct are unconstitutionally vague as applied because they fail to provide sufficient notice and warning of what conduct is prohibited. *See, e.g., H & V Eng'g, Inc. v. Idaho State Bd. of Prof'l Eng'rs and Land Surveyors,* 113 Idaho 646, 747 P.2d 55, 59 (1987) (finding that statute prohibiting unprofessional conduct did not provide sufficient warning to group of engineers that their acts would

subject them to discipline); *Tuma v. Bd. of Nursing,* 100 Idaho 74, 593 P.2d 711, 717 (1979) (finding that statute prohibiting unprofessional conduct did not adequately warn nurse that she was engaging in prohibited conduct); *Lester v. Dep't of Prof'l & Occupational Regulations,* 348 So.2d 923, 925–26 (Fla.Dist.Ct.App.1977) (finding that statute prohibiting unprofessional conduct did not adequately warn doctor that he was engaging in prohibited conduct).

In *Tuma,* a nurse appealed the decision of the Idaho Board of Nursing suspending her for six months for interfering with the physician-patient relationship by discussing alternative treatments with a leukemia patient. 593 P.2d at 712–14. The relevant statute prohibited "[i]mmoral, unprofessional, or dishonorable conduct," and the statute provided a non-exclusive list of acts that constituted "unprofessional conduct." *Id.* at 714–15. Interference with the physician-patient relationship was not specified as one of the prohibited acts. *Id.* The Idaho Supreme Court concluded that the statute did not adequately warn the nurse that her conduct was prohibited. *Id.* at 717. The court explained:

> The legislature has obviously recognized that the nurses who comprise the Board can, "from their personal knowledge and experience," determine the standards of

---

**3.** In *Megdal v. Oregon State Bd. of Dental Exam'rs,* the Oregon Supreme Court stated that

> when a licensing statute contains both a broad standard of "unprofessional conduct" that is not fully defined in the statute itself and also authority to make rules for the conduct of the regulated occupation, the legislative purpose is to provide for the further specification of the standard by rules, unless a different understanding is shown.

*Megdal v. Oregon State Bd. of Dental Exam'rs,* 288 Or. 293, 605 P.2d 273, 283 (1980). In

Minn.Stat. § 148.10, subd. 1(e)(9), the Minnesota legislature specifically provided the board with the authority to define by rule other acts that constitute unprofessional conduct. While I agree with the majority that the board has the authority to determine on a case-by-case basis what conduct constitutes unprofessional conduct, it would be much more efficient, effective, and fair for the board to use its rulemaking power, and I would encourage it to take advantage of that power in the future.

the profession. And accordingly opportunity was afforded the Board to expand upon the statutory definition of "unprofessional conduct." But, says the Board, it is enough that the Board will hear evidence of a licensee's conduct, and with its expertise then reach a conclusion whether such was or was not unprofessional. We cannot agree. Such a procedure would be an intolerable state of affairs, and not in compliance with requirements of due process.

*Id.* at 718.

Here, the board did not find that relator engaged in one of the acts the legislature defined as constituting unprofessional conduct. Instead, the board found that relator's conduct was unethical, deceptive, and harmful to the public, and that relator engaged in unprofessional conduct generally. The record shows, and the majority does not appear to dispute, that relator had no notice or warning that paying runners a flat salary to solicit patients for his chiropractic clinic constituted unprofessional conduct and would subject him to serious sanctions.[4] On this record, I would hold that the board's application of Minn. Stat. § 148.10. subd. 1(a)(11), (e), to relator is unconstitutionally vague as applied to him and a violation of his due process rights because he did not have sufficient notice or warning that his actions constituted unprofessional conduct under the statute. While, like the majority, I in no way condone relator's conduct and find it quite disturbing, it is when we find an individual's conduct most disturbing that we must be most vigilant in our protection of an individual's fundamental constitution-

al rights. Thus, like the majority, I would reverse the board's holding that relator engaged in fee splitting, but I would also reverse the board's holding that relator engaged in unprofessional conduct.

---

4. There is also evidence in the record that some chiropractors have been advised in continuing education classes that they can avoid fee-splitting violations by paying their runners a salary, which is the precise conduct that the board held constituted unprofessional conduct. This raises the prospect that relator will be the only one penalized for a practice that may be wide spread in the chiropractic community.